FARRELL FRITZ, P.C.
Martin G. Bunin
622 Third Avenue, Suite 37200
New York, NY 10017
Telephone: (212) 687-1230

*Counsel for Eric M. Huebscher, not individually
but solely in his capacity as Receiver*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re                                                                    Chapter 11

JEFFREY SOLOMON SIMPSON,                          Case No. 26-10359 (LGB)

                              Debtor.
------------------------------------------------------------X
JEFFREY SOLOMON SIMPSON, as Debtor        Adv. Pro. No. 26-01013 (LGB)
and Debtor in Possession,

                              Plaintiff,

              - against -

ERIC HUEBSCHER, as Receiver of Certain
Assets of JJ Arch,

                              Defendant.
------------------------------------------------------------X

**OBJECTION OF ERIC M. HUEBSCHER, IN HIS CAPACITY AS RECEIVER,
<u>TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF</u>**

Defendant Eric M. Huebscher, not individually but solely in his capacity as court-appointed

receiver (the "Receiver"), hereby objects (the "Objection") to the Motion for Injunctive Relief

Enforcing and Expanding the Automatic Stay (ECF No. 2) (the "Injunction Motion") filed by

Plaintiff Jeffrey Simpson (the "Debtor"). In support of this Objection, the Receiver submits the

Declaration of Eric M. Huebscher, in his capacity as Receiver, in Opposition to Plaintiff's Motion

for Injunctive Relief (the "Huebscher Declaration"), and respectfully states as follows:

## I.

## <u>RELEVANT FACTUAL BACKGROUND</u>

1.      The Court is respectfully referred to the Huebscher Declaration for a full recitation of the relevant facts.

## II.

## <u>LEGAL STANDARD</u>

2.      While not addressed in the Injunction Motion itself, the immediate relief sought by the Debtor in the Injunction Motion, and which this Court must consider at this juncture when the Receiver's response to the Debtor's complaint in this adversary proceeding is not yet due, is a preliminary injunction prohibiting the Receiver from conducting the Auction and shutting down the business the Debtor believes is operating on the Business Premises.  This is evident from the declaration from Debtor's counsel filed with the Injunction Motion "in support of a proposed order to show cause for a preliminary injunction and temporary restraining order." (ECF No. 3).

3.       "The Second Circuit recognizes a preliminary injunction as 'one of the most drastic tools in the arsenal of judicial remedies' that should be granted only in extraordinary circumstances."[1]  *Amusement Indus., Inc. v. Citigroup Glob. Mkts. Realty Corp. (In re First Republic Group Realty, LLC)*, 421 B.R. 659, 678 (Bankr. S.D.N.Y. 2009) (quoting *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985)).  This "extraordinary and drastic remedy" should not be granted unless the movant "*by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (internal quotation marks omitted) (emphasis in original); *see also Corp. Res. Servs.,* 2020 WL 1907538, at *6 ("Because the issuance of a

---

[1] The traditional standards for issuance of an injunction under Federal Rule of Civil Procedure 65 are made applicable to adversary proceedings under Federal Rule of Bankruptcy Procedure 7065.

preliminary injunction is considered an extraordinary remedy, the movant bears a heavy burden to show that it is entitled to an injunction.").

4.      A movant seeking a preliminary injunction must show that "(a) it will suffer irreparable harm in the absence of an injunction **and** (b) either (i) likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly in the movant's favor." *First Rep.*, 421 B.R. at 677 (citing *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238 (2d Cir. 2009)) (emphasis added).

5.      Section 105(a) of the Bankruptcy Code does not alter the analysis.  That provision gives the court general equitable powers, but only insofar as these powers are applied in a manner consistent with the Bankruptcy Code.  Nor does section 105(a) give the court the "power to create substantive rights that would otherwise be unavailable under the Code." *In re Morristown & Erie R. Co.*, 885 F.2d 98, 100 (3d Cir. 1989).  *If* an injunction would be consistent with the Bankruptcy Code, the bankruptcy court applies the general preliminary injunction standard, "as modified to fit the bankruptcy context," which includes consideration of the following factors:  (1) whether there is a likelihood of a successful reorganization; (2) whether there is imminent irreparable harm to the estate absent an injunction; (3) whether the balance of harms tips in favor of the moving party; and (4) whether the public interest weighs in favor of the injunction. *Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.)*, 543 B.R. 78, 118 (Bankr. S.D.N.Y. 2016).

6.      In the present case, the Debtor has failed to satisfy any of the required elements for a preliminary injunction. Therefore, the Debtor's request for a preliminary injunction must be denied.

**A.      The Debtor Cannot Make the Requisite Showing of Irreparable Harm.**

7.      Irreparable harm is "an injury that is not remote or speculative but actual and imminent, and that cannot be remedied by an award of money damages." *St. Joseph's Hospital Health Center v. American Anesthesiology of Syracuse, P.C.*, 141 F.4th 102, 106 (2d Cir. 2025) (citations omitted) (affirming denial of preliminary injunction where movant failed to show actual and imminent harm that could not be remedied by money damages).  "[I]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *First Rep.*, 421 B.R. at 678 (quoting *Grand River Enterp. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks and citations omitted)).

8.      Nowhere in the Injunction Motion or any of the papers filed with it does the Debtor establish or even allege that he will suffer harm that would not be compensable by money damages if the Auction were to occur or the business the Debtor believes is operating on the Business Premises shut down.  Regarding the unidentified personal property he fears may be sold through the Auction, the harm the Debtor would presumably suffer is the loss of that property.  The loss of personal property can be compensated through money damages.  It appears from the Schedules of Assets and Liabilities filed by Debtor (ECF No. 19) that the value he places on the items of personal property he believes belong to him and that are in the Receiver's possession is at most $34,500.[2]  Thus, in the unlikely event that the Debtor is permitted to and can establish that all these items of personal property belong to him such that he suffered a compensable loss when they were sold at the Auction, the Debtor can be compensated in money damages for this loss and the

---

[2] In his response to question 40 in Schedule B, the Debtor indicates that the value of "construction and mech tools + machinery" that he owns is $25,000 and that "some of" these items are held by the Receiver (*Id.*, at p. 9).  In his response to question 41 in Schedule B and in a document entitled "Schedule A/B, part 2 # 3" inserted at the end of Schedule B, the Debtor indicates that the value of automobiles he owns as "inventory" and that are being held by the Receiver is $9,500 (*Id.*, at pp. 9, 11).  The Debtor also indicates in this document that he owns automobile parts "collected by debtor over the years" and that are at the Business Premises, but no value is placed on these parts.

damages would not exceed $34,500. To put that figure in perspective, the amount of interest accruing *each month* on the mortgage loan encumbering the 1640 Montauk Property at which the Debtor evidently believes these items of property are located and which is being marketed for sale by the Receiver is $30,000 (*see* Huebscher Declaration, ¶ 55.d).

9. The loss the Debtor fears he will suffer if the business the Debtor believes is operating on the Business Premises is "shut down"[3] is the possible diminution in value of the 1640 Montauk Property at which the business is located, which he believes *may* expose him to personal liability on his guaranty of the mortgage loan encumbering the 1640 Montauk Property (*see* Injunction Motion, ¶¶ 16-20). This is not irreparable harm because the possibility that the mortgage loan encumbering 1640 Montauk Property may not be paid in full from the disposition of that property that is presently being marketed for sale it is not "actual and imminent" as is required on a motion for preliminary injunction. In any event, the Debtor makes no attempt in the Injunction Motion to explain how this "loss" he fears would not be compensable by money damages.

10. The Injunction Motion should be denied because the Debtor has not established that he or his bankruptcy estate will suffer irreparable harm if the Auction were to occur and the Rêver Motors business were to shut down.

**B. The Debtor Cannot Demonstrate Clear or Substantial Likelihood of Success on The Merits Regarding his Personal Property.**

**1. The Debtor has made no showing whatsoever that any of the assets located on the Business Premises constitute property of the bankruptcy estate.**

11. Even if the Court were to determine that the Debtor has made a strong showing of irreparable harm (he has failed to), the Debtor still is not entitled to the injunction because he

---

[3] As explained in Section II.C, *infra*, the Rêver Motors business is not operating and has never been operated by the Receiver.

cannot demonstrate that he has a clear or substantial likelihood of success on the merits. In fact, the Debtor has made no showing whatsoever that any of the assets located on the Business Premises constitute property of the estate. Unsupported, conclusory allegations of ownership do not carry the day. *See In re Weiss-Wolf, Inc.*, 60 B.R. 969, 975 (Bankr. S.D.N.Y. 1986) (In a motion for turnover under § 542, "the burden of proof…is at all times on the party seeking turnover [and] [t]hat party must establish a *prima facie* case (citing *Gorenz v. State of Illinois Dept. of Agriculture*, 653 F.2d 1179 (7th Cir. 1981)); Collier on Bankruptcy ¶ 542.03 (to support a cause of action for turnover, "the trustee has the burden of proof, by a preponderance of the evidence, to establish that…the property constitutes property of the estate").

12.     And, it is quite telling that the Adversary Complaint does not seek a turnover of any property located on the Business Premises. Rather, the Debtor merely seeks "an injunction enforcing the automatic stay to prevent the sale until there is a determination that no property of the estate will be sold" (Adversary Complaint, ¶ 37 [ECF No. 1]). But when will the Debtor seek that relief if not in the Adversary Proceeding? Since the appointment of the Receiver in the State Court Action in March 2025, it has been the Debtor's *modus operandi* to delay, impede and disrupt, and this Adversary Proceeding and the Injunction Motion are more of the same.

13.     That the Debtor failed to provide any proof of ownership in connection with the Injunction Motion comes as no surprise because the Debtor also failed to provide any proof of ownership in opposition to the Auction Motion, which eventually led the State Court to enter orders authorizing the Receiver to sell all assets located on the Business Premises (*see* Debtor's Opposition to Auction Motion [NYSCEF Doc. Nos. 1991 – 1992] in Index No. 158055/2023, Supreme Court of the State of New York, New York County).

14. The Receiver has requested proof of ownership of these assets from the Debtor for almost a year at this point, but the Debtor has failed to provide any (with the exception of a 2006 Porsche) despite the explicit provisions of the Receiver Order (*see* Receiver Order [NYSCEF Doc. No. 1360], p. 5; Enforcement Order [NYSCEF Doc. No. 1508], pp. 3-4; *see also* Letter from Martin G. Bunin to Counsel for the Debtor, dated March 26, 2025 [NYSCEF Doc. No. 1443], p. 1; E-mail from Martin G. Bunin to Rajotte dated April 8, 2025 [NYSCEF Doc. No. 1436], ¶ 34; E-mail from Martin G. Bunin to Rajotte dated July 24, 2025 [NYSCEF Doc. No. 2037]; E-mail from Martin G. Bunin to Rajotte dated August 18, 2025 [NYSCEF Doc. No. 2038]; E-mail from Martin G. Bunin to Rajotte dated August 6, 2025 [NYSCEF Doc. No. 2038]; E-mail from Martin G. Bunin to Rajotte dated September 8, 2025 [NYSCEF Doc. No. 2042]).

15. The Debtor's failure to make any showing (let alone by a preponderance of the evidence) that any assets located on the Business Premises are property of the bankruptcy estate requires denial of the Injunction Motion.

**2. The Debtor is Barred by the *Rooker-Feldman* Doctrine from Collaterally Attacking the State Court's Orders Concerning the Auction.**

16. The Debtor asserts in the Injunction Motion that, "[d]espite the provision in the Auction Order for the Debtor to be provided access to the Business Premises to identify his assets, there was not a satisfactory opportunity for the Debtor (accompanied by counsel) to visit the Business Premises to identify the property" (Injunction Motion, ¶ 11). However, the state court, in the Supplemental Auction Order, recited in detail the efforts of the Receiver to attempt to make arrangements for the Debtor to access the Business Premises to identify assets he claimed were his and the abusive and/or threatening responses of the Debtor and his counsel making it clear that the Debtor had no intention to visit the Business Premises to identify any such assets. Accordingly, the state court:

finds that the Receiver has provided Simpson access to the Business Premises as required by the Auction Order and that Simpson's failure to visit the Premises to identify the assets in which he claims ownership within the period provided in the Auction Order shall not be a basis for delaying the Receiver's sale of the Rêver Motors, assets located there…

(Supplemental Auction Order [NYSCEF Doc. No. 2335], p. 2).

17.     Since the state court in the Supplemental Auction Order found that the Debtor was afforded the required opportunity to access the Business Premises to identify any personally owned assets and authorized the auction to proceed, the Debtor may not now collaterally attack that finding of the state court.

18.     Under the *Rooker-Feldman* doctrine, lower federal courts lack subject matter jurisdiction to adjudicate collateral challenges to state court judgments or orders. *Hoblock v. Albany County Board of Elections*, 422 F.3d 77, 85 (2d Cir. 2005); *In re Ivani*, 308 B.R. 132, 136 (Bankr. E.D.N.Y. 2004) (applying *Rooker-Feldman* in bankruptcy case); *In re Salem*, 290 B.R. 479, 482 (S.D.N.Y. 2003); *see also Shelly v. Brandveen*, 2012 WL 3903472, at *3 (E.D.N.Y. Sept. 6, 2012) (noting that the *Rooker-Feldman* doctrine "applies not only to final judgments, but also interlocutory orders") (citations omitted).

19.     Under *Rooker-Feldman*, a federal court other than the Supreme Court lacks jurisdiction where, as here, (1) the federal-court plaintiff lost in state court; (2) plaintiff complains of injuries caused by the state court judgment or interlocutory order; (3) plaintiff invites the district court to review and reject those judgments or orders; and (4) the state court judgments or orders were rendered prior to the filing of the federal action. *Hoblock* 422 F.3d at 85 (2d Cir. 2005); *MacPhearson v. Town of Southampton*, 738 F.Supp.2d 353, 363 (E.D.N.Y. 2010) (*Rooker-Feldman* barred review of temporary restraining orders and preliminary injunctions because

"federal district courts lack jurisdiction to review state court decisions whether final or interlocutory in nature.") (citations omitted).

20.     Although "federal suits challenging interlocutory state judgments may present difficult questions as to whether 'the state proceedings have "ended" within the meaning of *Rooker-Feldman* on the federal questions at issue,'" *see Hoblock,* 422 F.3d at 89 (quoting *Federacion de Maestros de P.R. v. Junta de Relaciones del Trabajo de P.R.*, 410 F.3d 17, 25 (1st Cir. 2005)), courts in the Second Circuit have concluded that "*Rooker-Feldman* applies where the state proceeding has ended *with respect to the issues that the federal plaintiff seeks to have reviewed in federal court,* even if other matters remain to be litigated." *See Phillips ex rel. Green v. City of New York*, 453 F. Supp. 2d 690, 714 (S.D.N.Y. 2006) (quoting *Federacion*, 410 F.3d at 26); *see also Xu v. Suffolk Cnty.*, 2020 WL 3975471, at *3-6 (E.D.N.Y. July 14, 2020) (*Rooker-Feldman* applied to final Surrogate's court decision that was on appeal and proceedings were ongoing in the Surrogate's court after the federal case was filed); *Bartolini v. Mongelli*, 2018 WL 6333827, at *2, 6-7 (W.D.N.Y. Nov. 7, 2018) (applying *Rooker-Feldman* to final Surrogate's Court decree denying probate of a contested will, despite the existence of an ongoing accounting proceeding in Surrogate's Court).

21.     Here, it is clear from the face of the Injunction Motion that the Debtor is trying to challenge the Supplemental Auction Order's finding that the Debtor was afforded the required opportunity for access to the Business Premises to identify items he claims belong to him personally and the Auction Order that granted him that opportunity.  Moreover, the Injunction Motion implicitly challenges the sufficiency of the numerous opportunities that the Receiver gave to the Debtor to identify any personal property at Rêver Motors before and after the Receiver filed the Auction Motion, which opportunities are documented in detail in the Receiver's auction motion

papers (*see* the Receiver's Reply Affirmation [NYSCEF Doc. No. 2034], ¶¶ 7-17; Bunin Reply Affirmation [NYSCEF Doc. Nos. 2037 – 2042]).

22.     Applying the *Rooker-Feldman* doctrine, this Court, however, lacks jurisdiction to review the state court's Auction Order and the Supplemental Auction Order because (1) the Debtor lost in the state court, (2) the Debtor complains of an injury caused by the state court's Auction Order and Supplemental Auction Order; (3) the Debtor invites this Court to review and reject the Auction Order and Supplemental Auction Order; and (4) the Auction Order and Supplemental Auction Order were rendered prior to the filing of the Debtor's chapter 11 petition and this adversary proceeding.

**C.     The Debtor Cannot Demonstrate Clear or Substantial Likelihood of Success on The Merits Regarding the Shut Down of the Business.**

23.     The Debtor alleges in the Injunction Motion that the shutdown of Rêver Motors' business "will, by virtue of the loss of a grandfathered exception to the local zoning laws, result in a substantial diminution of the value of the [1640 Montauk Property]" (Injunction Motion, ¶ 1). "The shutting down of the business and concomitant loss of the value of the underlying real property due to imposition of zoning restrictions", continues the Debtor, "results in the risk of immediate economic consequences that are irreversible" (*Id.*, at ¶ 40).  However, contrary to the Debtor's assertions, (i) the Rêver Motors business is not operating and has never been operated by the Receiver, (ii) as a matter of law, the shutting down of the business by the Receiver does not eliminate the variance for the Business Premises from the local zoning restrictions, (iii) the Debtor does not own the 1640 Montauk Property, is unlikely to have any exposure on the guaranty he provided on the mortgage loan for the 1640 Montauk Property, and, in any event, the possibility of there being exposure on the guaranty is not an "immediate adverse economic consequence" to

the Debtor justifying an expansion of the automatic stay under Section 105 of the Bankruptcy Code.

**1.      No Auto Restoration Business is Operating on the Premises.**

24.      As detailed in his declaration, the Receiver has never operated the Rêver Motors business as he determined after obtaining access to the 1640 Montauk Property in May 2025 that the business was not viable (*see* Huebscher Declaration, at ¶15).  The Receiver cannot be enjoined from shutting down the Rêver Motors business for the simple reason that it is already shut down.

**2.      The Shutting Down of the Business by the Receiver Does Not Eliminate the Variance for the Business Premises from the Local Zoning Restrictions.**

25.      The Debtor asserts that (a) the Business Premises is currently zoned for residential use by the Town of Southampton, (b) the use of the Business Premises as an auto restoration and repair business is a grandfathered non-conforming use, and (c) the cessation of the operations of Rêver Motors will result in the loss of the grandfathered non-conforming use, which will cause a "substantial decline" in the value of the property under the zoning law of the Town of Southampton (Injunction Motion, ¶¶ 15, 18).  These assertions are based on a December 2025 letter from counsel that had represented 1640 Montauk LLC on zoning matters prior to the appointment of the Receiver (*see* Injunction Motion, Ex. E).

26.      The letter from the zoning lawyer, however, does not say that what the Injunction Motion claims it says.  Instead the letter expresses concern that the "temporary shutdown" of the Rêver Motors business and a possible change in use would need to be approved by the Town of Southampton zoning board and/or planning board (*Id*.).  The letter does not say that a temporary shutdown would result in a substantial decline in value.

27.      Moreover, the law of the Town of Southampton is clear that the cessation of the operations of Rêver Motors in 2025 has not affected the continued ability of a new owner to use

the Business Premises for auto restoration and repair or to apply to the Town of Southampton to permit a different use. The applicable Town of Southampton zoning statute provides, in pertinent part, that "[a] nonconforming use shall be deemed to have been abandoned . . . (2) . . . when it has been *voluntarily* discontinued for a period of 12 consecutive months; and . . . when it has not in fact been actually used for a continuous period of three years." Town of Southampton statute chapter 330, Article XVI, §330-118 (A) (2) (emphasis added).[4]

28. For the 12-month voluntary discontinuance provision to be triggered, the owner of the property must have voluntarily discontinued the nonconforming use for 12 months. *In re Savetsky v Board of Zoning Appeals of the Town of Southampton*, 5 AD3d 779 (App. Div. 2d Dept 2004). In *Savetsky*, the Appellate Division reinstated the determination of the Board of Zoning Appeals that the nonconforming use of the property at issue had not been voluntarily discontinued, holding:

> "Here, the Board determined that the nonconforming use had not been abandoned because, initially, it was discontinued pursuant to a court-ordered injunction, thus making the 12-month period for a finding of abandonment for a voluntary discontinuance inapplicable. * * *

---

[4] §330-118. Abandonment.
A. A nonconforming use shall be deemed to have been abandoned:
    (1) When it is changed to a conforming use.
    (2) In cases where such nonconforming use is of a building or structure designed for such use, when it has been voluntarily discontinued for a period of 12 consecutive months; and, in cases where such nonconforming use is of a building or structure designed for such use, when it has not in fact been actually used for a continuous period of three years.
    (3) In cases where such nonconforming use is of a building or structure not designed for such use or is of a lot or land whereon there is no consequential building or structure devoted to such use, when it has been voluntarily discontinued for a period of six consecutive months and, in such cases, when it has not in fact been actually used for a continuous period of 18 months.
B. A nonconforming use that has been abandoned shall not thereafter be reinstated.

The Code of the Town of Southampton, New York can be accessed at https://ecode360.com/SO0286.

Since there is evidence in the record that supports the Board's conclusion that the nonconforming use of the subject property had not been voluntarily abandoned, it was improper for the Supreme Court to find otherwise."

5 AD3d at 780.

29.     Here, it is undisputed that the Receiver, appointed by the state court and acting as an arm of that court, determined that the business of Rêver Motors was not viable in late May 2025, and has never operated the business.  The owner of Rêver Motors, 1640 Motors LLC, by and through the Debtor, has objected to the Receiver's determination and the cessation of the business, repeatedly and in multiple pleadings filed in the state court ever since the Receiver discontinued it.  The cessation of the operations of the Rêver Motors business was in no way voluntary on the part of its owner.  As a result, Section 330-118 (A)(2)'s 12-consecutive month voluntarily discontinuance provision is not applicable here, and the permitted nonconforming use of the Business Premises as an auto repair and restoration business will not be lost unless and until it is not actually used for that purpose for a continuous period of three years.

**3.     The Debtor does not own the 1640 Montauk Property and the hypothetical possibility of the Debtor having exposure on his guaranty of the mortgage loan is not an "immediate adverse economic consequence" justifying expansion of the automatic stay.**

30.     The Debtor acknowledges he does not own the 1640 Montauk Property.  Rather, he is member of JJ Arch (with Chassen owning the minority interest) which is the sole member of 1640 Montauk LLC, which owns the 1640 Montauk Property.  The protections of the bankruptcy automatic stay are afforded only to the debtor that is the subject of the bankruptcy case. *Teachers Insurance and Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986).  The automatic stay afforded to debtors by § 362(a) of the Bankruptcy Code "can apply to non-debtors, but normally does so only when allowing claim against the non-debtor to proceed will have an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v Nygard Intern.*, 321 F.3d 282, 287

(2d Cir. 2003). The *Queenie* court gave three examples of circumstances where it may be appropriate to extend the protections of the automatic stay to non-debtors: a claim to establish an obligation of which the debtor is a guarantor, a claim against the debtor's insurer and claims against a non-debtor where there is such an identity between the debtor and the non-debtor such that the debtor can be considered the real party in interest. *Id.*, at 287-88.

31.   Here, the cessation of the business operating on the Business Premises in anticipation of the sale of 1640 Montauk does not fit into any of the examples listed in *Queenie* and the Debtor has not cited to any decision in which a court has extended the automatic stay to prevent a nondebtor from disposing of its property in a manner that might hypothetically result in the deficiency on a loan guaranteed by the debtor. The possibility of the occurrence of a loan deficiency at a later date is not an "immediate" adverse economic consequence of the kind described in *Queenie*.

32.   The Second Circuit has further held that in order for the automatic stay to be applied to actions against non-debtors, the adverse impact on the debtor must "occur[] by operation of law." *Bayview Loan Servicing LLC v. Fogarty (In re Fogarty),* 39 F4th 62, 75 (2d Cir. 2022) (quoting *Picard v. Greenwich Fairfield, Ltd.* 762 F.3d 199, 208 (2d Cir. 2014)). In contrast, the automatic stay does not bar "actions taken against third parties that are only factually likely, as opposed to legally certain, to impact estate property." *Fogarty*, 39 F.4th at 75 (quoting *Greenwich Fairfield, Ltd.,* 762 F.3d at 208)).

33.   The cessation of the Rêver Motors business is certainly not legally certain to adversely impact the Debtor. Further, based on the purchase price amounts being discussed with a party expressing an interest in purchasing the 1640 Montauk Property, the Receiver is hopeful that the property will sell for significantly more than the outstanding amount on the mortgage loan,

which would benefit the Debtor and Chassen by terminating their personal guaranties on the mortgage loan (*see* Huebscher Declaration, at ¶ 55(d)).

**WHEREFORE,** for the foregoing reasons, the Receiver respectfully request that the Court enter an order denying the Motion and granting such other and further relief as the Court deems just and proper.

Dated: March 17, 2026
     New York, New York               **FARRELL FRITZ, P.C.**

By: /s/ *Martin G. Bunin*
    Martin G. Bunin
    622 Third Avenue, Suite 37200
    New York, New York 10017
    Telephone: (212) 687-1230
    Email: mbunin@farrellfritz.com

*Counsel for Eric M. Huebscher, not individually but solely in his capacity as Receiver*

FF\50551297.4