FARRELL FRITZ, P.C.
Martin G. Bunin
622 Third Avenue, Suite 37200
New York, NY  10017
Telephone: (212) 687-1230

*Counsel for Eric M. Huebscher, not individually
but solely in his capacity as Receiver*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

In re

JEFFREY SOLOMON SIMPSON,

                            Debtor.

-------------------------------------------------------------X

JEFFREY SOLOMON SIMPSON, as Debtor
and Debtor in Possession,

                            Plaintiff,

         - against -

ERIC HUEBSCHER, as Receiver of Certain
Assets of JJ Arch,

                            Defendant.

-------------------------------------------------------------X

Chapter 11

Case No. 26-10359 (LGB)

Adv. Pro. No. 26-01013 (LGB)

### DECLARATION OF ERIC M. HUEBSCHER, IN HIS CAPACITY AS RECEIVER, IN <u>OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF</u>

       **ERIC M. HUEBSCHER,** not individually but solely in his capacity as court-appointed

receiver, hereby declares under penalty of perjury pursuant to 28 U.S.C. § 1746(a) as follows:

       1.      I am the temporary receiver (the "Receiver") appointed in the action entitled

*Jeffrey Simpson, et al. v Jared Chassen, et al.,* Index No. 158055/2023 (Supreme Court, County

of New York: Commercial Division) (the "State Court Action").

2. By order dated March 11, 2025 (the "Receiver Order") (NYSCEF Doc. No. 1360),[1] I was appointed Receiver over (1) the managerial and membership interests of JJ Arch LLC in the JJ Arch Controlled Entities, a term defined in the Receiver Order to include 1640 Montauk LLC ("1640 Montauk"), 1640 Motors LLC d/b/a Rêver Motors ("Rêver Motors") and 146 E 89 Borrowers 1, 2 and 3 LLC, JJ NY 550 LLC and 225 HPR LLC, (2) the JJ Arch Controlled Properties, a term defined in the Receiver Order to include the business of Rêver Motors and the property on which it conducts business located at 1640 Montauk Highway, Water Mill, New York (the "Business Premises" or the "1640 Montauk Property"), the townhouse located at 146 East 89th Street, New York, New York ("146 East 89th Street"), the retail condo unit located at 550 Metropolitan Avenue, Brooklyn, New York (the "550 Metro Retail Condo") and the residential property located at 225 Head of Pond Road, Water Mill, New York ("225 HPR") and (3) JJ Arch's bank accounts, records and funds, and the JJ Arch Controlled Entities' funds, assets, properties and bank accounts (Receiver Order, p. 2).

3. The Receiver Order granted me "complete and sole managerial authority" over the JJ Arch Controlled Entities and JJ arch Controlled Properties (Receiver Order [NYSCEF Doc. No. 1360], p.3). It authorizes me to, among other things, manage, rent, lease, sell or develop the JJ Arch Controlled Properties and to take such other steps to dispose of the receivership assets as I deem necessary to maximize the value of the JJ Arch Controlled Entities and JJ Arch Controlled Properties (*Id.*, pp. 3-4).

4. I respectfully submit this affirmation in opposition to the motion (the "Injunction Motion") of Jeffrey Simpson, Debtor ("Simpson") for an order "enjoining the Receiver from

---

[1] "NYSCEF" refers to the New York State Courts Electronic Filing system, and citations to NYSCEF refer to specific filings in the State Court Action or the other actions referenced herein, as the context dictates. Due to the voluminous filings in the State Court Action, in lieu of being physically attached as exhibits, most of the documents are cited to the NYSCEF record with hyperlinks.

selling assets claimed to belong to the Debtor's estate until such claims can be resolved" (Injunction Motion [ECF No. 2], p. 9) and "enjoining the Receiver from conducting an auction for property located on the premises of 1640 Montauk Highway, Water Mill, New York 11976" (Proposed Order to Show Cause [ECF No. 3], p. 2). The auction Simpson seeks to enjoin is the auction of the assets of Rêver Motors located on Rêver Motors' Business Premises.

### SUMMARY

5.      Rêver Motors was an auto restoration and sales business. Simpson and Jared Chassen ("Chassen"), defendant/counterclaim plaintiff in the State Court Action, began operating Rêver Motors in June 2022. To assist the Court in understanding the physical condition of the Rêver Motors business, Business Premises and assets, attached hereto as **Exhibit 1** are several photos of portions of the Business Premises taken after I first gained access to it in mid-May 2025, showing portions of the property where vehicles, vehicle shells and vehicle debris are located, as well as the indoor storage areas for vehicle parts, equipment and tools.[2] The Business Premises, outdoors and indoors, was a junk yard at the time of my appointment. It remains in this condition, except that the auctioneer authorized by the state court to sell Rêver Motors' assets has since organized many of the assets located indoors into lots for the auction sale. As discussed more fully below, I never operated the Rêver Motors business because I determined the business was not viable, and began the process of returning customer and financed vehicles in late May 2025.

6.      Simpson could not re-start the Rêver Motors business under any circumstances. As is detailed below, the Business Premises is the subject of a mortgage foreclosure action commenced in 2024. As of mid-May 2025, when I first gained access to the Business Premises,

---

[2] The abbreviation "VINs" appearing on a few of the photos means vehicle identification numbers. A vehicle identification number is a vehicle's fingerprint. The photos were also filed in the State Court Action at NYSCEF Doc. No. 1825.

Rêver Motors, among other things, had failed to pay payroll taxes, had no insurance on the Business Premises or business assets, had almost no funds available to continue operations, had at least $2 million in debt, had no known accounts receivable, had an unknown amount of past wages due employees, and had failed to pay amounts due the New York State ("NYS") Workers' Compensation Board. By July 2025, the IRS had liened and levied on Rêver Motors' assets and the NYS Department of Motor Vehicles had opened a number of investigations into Rêver Motors based on customers' complaints and terminated its vehicle repair shop license.

7.        Simpson's assertions that he owns vehicles, vehicle shells, vehicle parts, equipment or tools located on the Business Premises are devoid of proof:

a. Simpson failed to provide any proof to me or the state court that he owned any assets located on the Rêver Motors' Business Premises despite numerous requests and opportunities for Simpson to do so from May 2025 through January 2026 (except for one vehicle, which Simpson himself removed from the Business Premises, and a toolbox he says his father gave him, which he has never arranged to pick up). Further, Simpson willfully failed and refused to obey the provisions of the Receiver Order and a subsequent order enforcing the Receiver Order entered by the state court in May 2025 that required him to furnish me with an inventory list of the vehicles located at the Business Premises that Rêver Motors owns and that he claims to personally own.

b. Promptly after the entry of the Auction Order by the state court and pursuant to its terms, on three separate occasions I offered Simpson access to the Business Premises to identify and document what he claimed he owns. But Simpson's only responses to the offers of access were a threatening voicemail message and threatening e-mails to my counsel, and

4

an abusive, conspiratorial e-mail message from Simpson's counsel to my counsel (see pars. 36-38 below and the transcribed voice mail message and e-mails attached as an exhibit).

8. The prompt auction sale of Rêver Motors' assets is required to maximize the value of the Business Premises, which I have been marketing with the state court's approval, as well as to maximize the value of Rêver Motors' assets.

9. Simpson has been sanctioned and enjoined in this litigation by the U.S. District Court for the Southern District of New York (the "District Court") and sanctioned four times in the State Court Action.

10. Once in late March 2025, and for a second time in late May 2025, Simpson frivolously and baselessly removed this action to the District Court. The District Court twice remanded the action to the state court and, following the second remand, enjoined Simpson from any further removals without the District Court's prior permission. It awarded $27,081 in attorney's fees and $190.62 in costs to Chassen's counsel (June 27, 2025 Memorandum Opinion and Order (J. Furman) [NYSCEF Doc. No. 1635]). In issuing the injunction, the District Court held that "Simpson's vexatious history of litigation is evidenced by his three baseless attempts to remove this action to federal court". "Simpson's record of frivolous removal efforts", the District Court continued, "coupled with his vexatious conduct in state court – have caused needless expense to other parties, burdened the federal and state courts involved, and leads the Court to believe that Simpson 'used the removal as a vehicle to defy the [state court's] orders.'" *Id.* at 2.

11. Simpson has been sanctioned four times by the state court for willfully and repeatedly disregarding its directions to stop sending e-mails directly to Justice Joel M. Cohen, before whom the State Court Action is pending. The e-mails have often been abusive, including a statement that Justice Cohen is "on the take", "has a corruption problem" and daring Justice

Cohen "to give [him sanctions]": "If you want to assess me a fine, do." Justice Cohen fined Simpson four times and Simpson, on information and belief, paid none of them (*see infra*, ¶¶ 45-50).

12. Simpson is the subject of a civil and criminal contempt motion in the State Court Action for his continuous, willful disobedience of the Receiver Order and a subsequent order of the state court compelling Simpson's compliance with the Receiver Order. Simpson prevented me from performing my court-ordered duties for months by, among other things, expelling me from the Business Premises, destroying an alarm system I installed at another receivership property in the presence of a police officer, repeatedly changing the locks on receivership property, threatening me, and sending me and the state court abusive communications (*see infra*, ¶¶ 52-53). The state court held an evidentiary hearing on the civil and criminal contempt motion over four days, which is currently under submission.

## RÊVER MOTORS WAS NOT A VIABLE BUSINESS AND THE STATE COURT AUTHORIZED THE SALE OF THE BUSINESS PREMISES

13. Simpson and Chassen began operating Rêver Motors beginning in June 2022.

14. Upon my appointment on March 11, 2025, I learned that, due to the failure of Rêver Motors to pay rent to its affiliated landlord, 1640 Montauk LLC, the owner of the Business Premises (and a JJ Arch Controlled Entity under receivership), and the resulting failure of 1640 Montauk LLC to make payments on its mortgage loan for more than a year, the mortgage lender commenced a foreclosure action against 1640 Montauk LLC, seeking to foreclose its mortgage lien on the Rêver Motors Business Premises. *Watermill Capital Holdings LLC v 1640 Montauk LLC, et al.*, Index No 623575/2024 (Supreme Court, Suffolk County). The mortgage loan bears a default rate of interest of 24% per annum (*see* First Mortgage Note [NYSCEF Doc. No. 4 in the *Watermill* foreclosure action], p. 2, ¶ 7).

15. Based on my visits to Rêver Motors between May 14 and May 23, 2025, and my review of the information and documents available, I determined that Rêver Motors was not a viable business (*see* Receiver's First Interim Status Report filed May 23, 2025 [NYSCEF Doc. No. 1528], p. 3). In addition to the failure to pay rent and the pendency of the mortgage foreclosure action, I found that Rêver Motors had (1) at least $2,000,000 in liabilities, (2) only $23,624.11 available for continuing business operations, (3) no known accounts receivable, (4) an unknown amount of unpaid vendor obligations, (5) secured debt to NextGear Capital, Inc., an automobile finance lender, of about $164,000, (6) an unknown amount of past wages due former employees, (7) no insurance on the 1640 Montauk Property or Rêver Motors' business assets and (8) no reliable inventory of vehicles or parts (*Id.*, pp. 2-4). Based on that determination, I never operated the Rêver Motors business and began the process of returning customer and financed vehicles (*Id.*).

16. By the time I filed my Second Interim Status Report ("2nd Report") on July 18, 2025 (*see* NYSCEF Doc. No. 1680) and the supplement to my 2nd Report ("2nd Report Supp") on July 30, 2025 (*see* NYSCEF Doc. No. 1700), I learned that, in late June 2025, the Internal Revenue Service ("IRS") sent a notice of levy to Rêver Motors for $164,012.83 in unpaid payroll taxes due, beginning in June 2022 – the month Rêver Motors began operating – through March 2024, and a notice of intent to levy on an additional $65,883.46 for unpaid payroll taxes due in June 2024 (*see* 2nd Report Supp, pp. 1-2; Tax Delinquency Notices [NYSCEF Doc. No. 1753], pp. 21-22, 13-18).[3]

17. I also learned that Rêver Motors failed to pay NYS unemployment insurance premiums of more than $6,000, and received a notice from the NYS Workers Compensation Board of an amount due of more than $27,000 (*see* 2nd Report Supp [NYSCEF Doc. No. 1700], pp. 2-

---

[3] The IRS informed me that the unpaid payroll taxes were withholding taxes that Simpson withheld from Rêver Motors' employees' wages and failed to remit to the IRS (*see* 2nd Report Supp [NYSCEF Doc. No. 1700], p. 2; 3rd Report, page 4 [NYSCEF Doc. No. 1837]).

3). As of the end of July 2025, the IRS levy and notice of levy amounts totaled approximately $230,000, and the unpaid NYS obligations totaled about $35,000 (*Id.*).

18.     Additionally, I was informed by the NYS Department of Motor Vehicles ("DMV") that it had multiple ongoing cases related to the conduct of Rêver Motors' business, related to incomplete or missing paperwork, inaccurate titling and incorrect use of DMV registration portals, which are used by dealerships to register and process vehicle titling (*see* 2nd Report [NYSCEF Doc. No. 1680], p. 3; July 21, 2025 Hearing Tr. [NYSCEF Doc. No. 2000] 39:17–39:21 (in which I testified: "I can tell you that the Department of Motor Vehicles is concerned about the conduct of the business.  There are at least seven ongoing investigations into the conduct of the business, each one of them constituting a potential fraud.").

19.     By the time I filed my Third Interim Status Report ("3rd Report") on September 15, 2025 (NYSCEF Doc. No. 1837), I learned that (1) Rêver Motors had lost its DMV license to operate as a vehicle repair shop and (2) there was no indication that Rêver Motors had remitted any collected New York State sales tax or filed any NYS sales tax returns (*see* 3rd Report, pp. 4-5).

20.     Additionally, the 3rd Report, in a chart, shows the potential customer damages directly caused by Simpson's conduct, including what appear to be a number of instances of outright theft or diversion of funds from 14 customers of Rêver Motors with a total of $372,000 in financial losses (*Id.*, p. 5).  These claims include Simpson's diversion of customer funds for other uses, his failure to turn over the proceeds of consignment sales to the consignor/customer, his apparent theft of consigned parts, the dismantling of customer vehicles to supply parts to other vehicles he was working on, and claims related to certificates of title (*Id.*).  One Rêver Motors customer, Everett Ballenger, paid Simpson $40,000 in 2024 to restore a functioning, vintage red

Land Rover vehicle. Simpson failed to do any work to restore it and, in fact, removed parts from the vehicle, essentially destroying it. Before and after photos of Mr. Ballenger's red Land Rover, the first taken prior to delivery to Rêver Motors and the second in its current condition, are found at NYSCEF Doc. No. 1838. James Gerstein, another Rêver Motors customer, paid Rêver Motors approximately $39,000 to build and refurbish a vehicle (3rd Report, p. 5 and fn. 9). A photo of Mr. Gerstein's vehicle in its current condition is found at NYSCEF Doc. No. 1839. Curiously, Simpson called Mr. Gerstein as a witness at his state court contempt hearing. Mr. Gerstein testified that, after speaking with me and I was able to locate his vehicle on the Business Premises, he learned his vehicle was "just a pile of . . .four wheels on a chasis and a bunch of rust and you know – it was worthless." (*see* July 21, 2025 Hearing Tr. [NYSCEF Doc. No. 2000] 133:7-133:9).

21.     For all of these reasons, I determined that Rêver Motors was not a viable business. As a result, to maximize the value of its assets and the Business Premises, the state court entered an order authorizing me to retain two real estate brokers to market and sell the Business Premises (*see* Order Approving Retention of Brokers [NYSCEF Doc. No. 1764]). Simpson did not appeal that order.

**THE STATE COURT APPROVED THE PUBLIC
AUCTION SALE OF RÊVER MOTORS' ASSETS**

22.     The assets of Rêver Motors consist of vehicles, shells of vehicles, vehicle parts, equipment and tools which are strewn about the Business Premises, outdoors and indoors. The Business Premises is, for all intents and purposes, a junk yard, and Rêver Motors' personal property needs to be removed in order to effectively market and sell the Business Premises (s*ee* photos attached as **Exhibit 1** and at NYSCEF Doc. No. 1825).

23.     I am currently marketing the Business Premises, and prospective buyers frequently ask and want to be assured that, if they purchase the premises, they will not be burdened with

clearing out and removing Rêver Motors' vehicles, vehicle remains, salvage and debris. The Rêver Motors auction sale is as important to maximize the value of the Business Premises as it is to maximize the value of the Rêver Motors assets.

24. On September 5, 2025, I filed a motion seeking an order, among other things, approving the public auction sale of Rêver Motors' assets, and the retention of an auctioneer to conduct the sale (the "Auction Motion") (NYSCEF Doc. Nos. 1821 – 1831).

25. Before the filing of the Auction Motion, Simpson had asserted that he personally owned vehicles, equipment and tools on the Business Premises, but did not provide any proof of ownership (except for one vehicle) despite the explicit provisions of the Receiver Order requiring him to do so. The Receiver Order required Simpson to "immediately provide the Receiver. . .(2) an inventory of all assets belonging to the JJ Arch Controlled Entities, including a list of vehicles at, or that were at, Rêver Motors since August 2023, whether titled in Simpson's name, the name of any entity controlled by Simpson, or the name of a JJ Arch Controlled Entity" (Receiver Order [NYSCEF Doc. No. 1360], p. 5).

26. Simpson failed and refused to provide the required list. On May 13, 2025, the state court issued an order directing Simpson to comply with the Receiver Order (the "Enforcement Order") (NYSCEF Doc. No. 1508). The Enforcement Order contains the identical provision requiring Simpson to provide me with a list of vehicles at Rêver Motors "whether titled in Simpson's own name, the name of any entity controlled by Simpson" or in the name of Rêver Motors (Enforcement Order, pp. 3-4), as well as the original certificates of title for each vehicle owned by any of the JJ Arch Controlled Entities (*Id.*, p. 4).

27. A letter from my counsel to Simpson's counsel dated March 26, 2025 demanded the required list of vehicles (*see* NYSCEF Doc. No. 1631). My counsel followed up on April 8,

2025 with an e-mail demand to Simpson's counsel (*see* NYSCEF Doc. No. 1632). My counsel received no response to the letter or the e-mail.

28. To date, Simpson has willfully failed and refused to provide the required list of vehicles and any certificates of title. In response to one of those requests, Simpson responded directly to me in an e-mail, stating: "All has been said to the federal court so you will stand down." (Auction Motion [NYSCEF Doc. No. 2034], ¶ 9).

29. After filing the Auction Motion, I continued to request that Simpson provide documentation of his ownership of any assets located at the Business Premises. Those multiple requests are detailed in my Reply Affirmation (NYSCEF Doc. No. 2034, ¶¶ 11-16) and the Reply Affirmation of Martin G. Bunin in further support of the Auction Motion (NYSCEF Doc. No. 2036, ¶¶ 2-7, Exhibits 1-6 [NYSCEF Doc. Nos. 2037 – 2042]). The only personal property for which Simpson provided proof of ownership was one car (which Simpson then informed me he had already removed from the Business Premises months previously). Simpson also claimed, in an e-mail sent on September 20, 2025, that his father had given him a Snap On red metal toolbox for which he had the key. The Receiver promptly told Simpson he could arrange to retrieve the toolbox (*see* Reply Affirmation [NYSCEF Doc. No. 2034], ¶ 15). Simpson did not do so, and has not done so to date.

30. Simpson objected to the Auction Motion with an Attorney Affirmation ("Auction Opp. Aff.") (NYSCEF Doc. No. 1992) and a memo of law entitled Opposition to Liquidation of Rêver Motors (the "Auction Opp. Memo") (NYSCEF Doc. No. 1991). The Auction Opp. Memo argued that Simpson personally owns vehicles, tools and equipment on the Business Premises, but provided no documentation of ownership whatsoever. Simpson did not submit an affidavit in opposition to the Auction Motion.

31.     Simpson also argued in opposition to the Auction Motion that I could not sell the personal property located at the Business Premises because it was the collateral of secured creditor NextGear, which provided financing for a number of Rêver Motors' vehicles (*see* Auction Opp. Memo [NYSCEF Doc. No. 1991], pp. 1-2, 4-6; Auction Opp. Aff. [NYSCEF Doc. No. 1992], pp. 1-2).  However, NextGear had (a) already repossessed a number of the vehicles located at the Business Premises which it had financed and (b) abandoned its security interest in all of the vehicles and parts that remained on the Business Premises in a settlement agreement with the Receiver (NYSCEF Doc. No. 2013), which was approved by order of the state court dated December 12, 2025 (NYSCEF Doc. No. 2170).

32.     After hearing oral argument on the Auction Motion on December 11, 2025, the state court granted the Auction Motion in part by order and decision entered December 23, 2026 (the "Auction Order") (NYSCEF Doc. Nos. 2198 – 2199).

33.     The Auction Order authorized me "to sell all Assets of Rêver Motors as to which ownership is undisputed (or if disputed, has been determined to be the property of Rêver Motors as provided below), including vehicles, machinery, equipment, inventory, tools and supplies" (Auction Order [NYSCEF Doc. No. 2198], p. 2).  It further directed that "Simpson (accompanied by counsel) shall, within fourteen (14) days of entry of this order, be provided access to the Business Premises to identify assets to which Simpson claims ownership and can demonstrate, to the Receiver's satisfaction and subject to the Court's review, such ownership, and that such assets shall not be sold by the Receiver. . ." (*Id.*, pp. 2-3).

34.     Additionally, since there was evidence that Simpson improperly removed Rêver Motors vehicles from the Business Premises to a nearby residential property he owns or elsewhere in the Southampton area, the Auction Order (a) granted my agents and me immediate access to

these properties to conduct an inspection of the vehicles located there, (b) required Simpson to turn over to me any Rêver Motors vehicles that had been removed, (c) required him to account for any removed vehicles that he sold, including the bills of sale and the bank accounts into which he deposited the proceeds and evidence that sales tax had been paid and (d) required Simpson to turn over such proceeds to me (Auction Order [NYSCEF Doc. No. 2198], p. 4). Simpson refused to grant me access, refused to turn over any of the removed vehicles, failed to account for any such vehicles he had sold and failed to turn over the proceeds of such sales.

35. The Auction Order also ordered Simpson to turn over to me, within 14 days, the $10,000 in sales proceeds of a flatbed truck that was owned by Rêver Motors, transferred to another entity solely owned by Simpson and then sold to a third party by Simpson; or provide documentary evidence that the proceeds had been previously turned over to Rêver Motors (Auction Order [NYSCEF Doc. No. 2198], pp. 3-4). Simpson failed to turn over the sales proceeds or provide evidence that they already had been.

**THE RECEIVER PROMPTLY OFFERED SIMPSON ACCESS TO THE BUSINESS PREMISES BUT HE DECLINED ACCESS AND FAILED TO MAKE ANY ARRANGEMENT FOR ACCESS**

36. Promptly after entry of the Auction Order, on December 24, 2025, my counsel e-mailed Benjamin R. Rajotte, Esq. ("Rajotte"), Simpson's counsel, and requested that he contact my counsel to arrange for access to the Business Premises by Simpson to identify assets to which he may claim ownership (*see* Letter of M. Bunin to the Hon. Joel M. Cohen, dated January 8, 2026 ("January 8 Letter"), attached hereto as **Exhibit 2**, p. 2 [NYSCEF Doc. No. 2221]; *see also* E-mail from M. Bunin to Rajotte, dated December 24, 2025, attached hereto as Exhibit 2 [NYSCEF Doc. No. 2222]). Rajotte responded to my counsel's e-mail the same day, saying:

"We'll see about all that Marty.

This is never going to happen as long as I'm involved in protecting him [Simpson] from your cover up.

Proceed accordingly."

(E-mail from Rajotte to M. Bunin, dated December 24, 2025, attached hereto as Exhibit 2 [NYSCEF Doc. No. 2222]). The state court read this passage from the January 8 Letter and Rajotte's e-mail out loud at a status conference held on January 21, 2026.

37. My counsel sent a follow-up e-mail to Rajotte on December 29, 2025, making the same request that Simpson arrange access to the Business Premises (*see* E-mail from M. Bunin to Rajotte, dated December 29, 2025, attached hereto as Exhibit 2 [NYSCEF Doc. No. 2222]). My counsel received no response to his December 29 e-mail. On January 5, 2026, my counsel sent another e-mail to Rajotte making the same request (*see* E-mail from M. Bunin to Rajotte, dated January 5, 2026, attached hereto as Exhibit 2 [NYSCEF Doc. No. 2222]). My counsel received no response from Rajotte to his January 5 e-mail.

38. Simpson, however, responded to the entry of the Auction Order and the Receiver's requests to implement the Auction Order's directives by leaving my counsel a threatening voice mail message and sending him threatening and abusive e-mails (*see* Transcribed Voice Mail Message from Simpson to my counsel on December 29, 2025 at 9:44 AM [NYSCEF Doc. No. 2223] ("And if you think you're gonna touch any piece of my property, the police will be involved immediately…It's not a threat. It's a promise. You don't have any right to touch my stuff."); E-mail from Simpson to Martin G. Bunin, dated December 29, 2025 at 9:45 AM [NYSCEF Doc. No. 2223] ("Don't go near anything that belongs to me…If you plan to do something we're calling the police immediately…"); E-mail from Simpson to Martin G. Bunin, dated December 29, 2025 at

10:01 AM [NYSCEF Doc. No. 2223] ("You will do nothing whatsoever. You want to do something the police will be involved."); E-mail from Simpson to Martin G. Bunin, dated December 29, 2025 at 3:33 PM [NYSCEF Doc. No. 2223] ("So who lied today? Is it you Marty you disgusting pig?...I hope you called the police back and you could tell him you're [sic] bullshit angle to steal my stuff. You don't have a right to do anything and the court orders are all nonsense because we have a judge that's corrupt and on the take."; *see also* Ex. 2).

39. The 14 days within which Simpson was to be provided access to the Business Premises passed. Simpson failed to make any request or arrangements to obtain access to the Business Premises to identify assets he claims were owned by him personally and failed to indicate any interest in making arrangements for access, despite repeated requests.

40. Moreover, I was served with a property execution by a judgment creditor of Simpson. As a result, if Simpson were conceivably able to demonstrate personal ownership of property items currently located at the Business Premises, the Receiver would have been unable to turn over that property to him (January 8 Letter [NYSCEF Doc. No. 2221], p. 3).

41. As a result of Simpson's failure and refusal to access the Business Premises and identify assets he asserted were his, I requested, per the January 8 Letter, that the state court enter a supplemental order authorizing me to proceed with the sale of all of Rêver Motors' assets located on the Business Premises.

42. The state court issued the Supplemental Order Authorizing Sale of Rêver Motors' Assets on January 23, 2026 (the "Supplemental Auction Order") (NYSCEF Doc. No. 2335). The Supplemental Auction Order recites in detail the efforts I made to afford Simpson access to the Business Premises to identify assets he claimed were his, and refers to the abusive and/or threatening responses of Simpson and his counsel making it absolutely clear that Simpson had no

intention of visiting the Business Premises to identify any such assets. Accordingly, the state court found that:

> the Receiver has provided Simpson access to the Business Premises as required by the Auction Order and that Simpson's failure to visit the Premises to identify the assets in which he claims ownership within the period provided in the Auction Order shall not be a basis for delaying the Receiver's sale of the Rêver Motors, assets located there…

(Supplemental Auction Order [NYSCEF Doc. No. 2335], p. 2).

43. After reciting the efforts I made to arrange access for Simpson (and his counsel) as required by the Auction Order, the Supplemental Auction Order authorized the Receiver "to proceed with the sale of all of Rêver Motors' assets located on the Business Premises" (*Id.*, p. 3).

## THE DISTRICT COURT'S IMPOSITION OF SANCTIONS
## AND AN INJUNCTION AGAINST SIMPSON

44. Once in late March 2025 and for a second time in late May 2025, Simpson frivolously and baselessly removed the State Court Action to the District Court. The District Court twice remanded the action to the state court and, following the second remand, enjoined Simpson from any further removals without the District Court's prior permission. It awarded $27,081 in attorney's fees and $190.62 in costs to Chassen's counsel (*see* June 27, 2025 Memorandum Opinion and Order (J. Furman) [NYSCEF Doc. No. 1635]). In issuing the injunction, the District Court held that "Simpson's vexatious history of litigation is evidenced by his three baseless attempts to remove this action to federal court". "Simpson's record of frivolous removal efforts", the District Court concluded, "coupled with his vexatious conduct in state court – have caused needless expense to other parties, burdened the federal and state courts involved, and leads the Court to believe that Simpson 'used the removal as a vehicle to defy the [state court's] orders." (*Id.*, p. 2).

**THE STATE COURT'S FOUR SANCTIONS ORDERS AGAINST SIMPSON**

45. Simpson has been sanctioned four times in the State Court Action by Justice Cohen for willfully and repeatedly disregarding directions from the court to stop sending e-mails (many of them abusive) directly to Justice Cohen's chambers e-mail address (*see* NYSCEF Doc. Nos. 1847, 1851, 1998, 2157).

46. The state court first sanctioned Simpson for, among other things, sending *ex parte* e-mails directly to the State Court, copying only his counsel (*see* Order entered September 25, 2025 [NYSCEF Doc. No. 1847]). The State Court fined Simpson $500 and warned that the next violation would result in an increased monetary sanction (*Id.*, p. 3). The State Court attached several of Simpson's e-mails, which include the following that Simpson sent to Justice Cohen:

- "I am left with no choice but to ask for your immediate recusal…" (*Id.*, p. 5).

- "You have not seen this case in an unbiased way since the very beginning… The perjury that has gone on in front of the eyes of this court that is not adjudicated, unconscionable [sic]." (*Id.*).

- "[I] think we all know it's time for me to respectfully ask you to stand down from this case or adjudicate what's really going on without wasting another two years of my life…" (*Id.*).

- "If you want to assess me a fine, please do." (*Id.*, p. 4).

47. Four days later, on September 29, 2025, the state court sanctioned Simpson again for sending eight additional violative e-mails to the state court. The first began as follows: "So this time I'm going to step on the rules (the ones that apply only to thieves and to the judge (when he wants to) who has a serious memory and corruption problem) please issue me a fine and I'll appeal it, whatever it takes to get me far away from you because you have no respect for me and

my rights, zero." (9/29/25 Order Imposing Sanctions [NYSCEF Doc. No. 1851], p. 1).  The Trial Court fined Simpson $1,000.

48.     On October 8, 2025, the State Court issued its third Order Imposing Sanctions against Simpson. Despite the prior sanctions orders, within four days of the entry of the second Order Imposing Sanctions, Simpson sent an additional nine e-mails in further violation of the State Court's rules (*see* 10/8/25 Order Imposing Sanctions [NYSCEF Doc. No. 1998]).  The State Court fined Simpson $1,500 (*see Id.*).

49.     On December 5, 2025, the state court issued its fourth Order Imposing Sanctions against Simpson for sending more than a dozen more e-mails to the court (*see* 12/5/25 Order Imposing Sanctions [NYSCEF Doc. No. 2157]).  "With each successive e-mail", ruled the state court, "Mr. Simpson has become increasingly aggressive and abusive, among other things repeatedly and baselessly accusing the Court of being 'on the take' and daring the Court 'to give [him sanctions]'" (*Id.*, pp. 1-2). "These persistent and brazen violations – committed while Mr. Simpson is the subject of a separate civil and criminal contempt motion for violating prior Court orders – have stymied the efficient progress of this case and related cases, burdened chambers with improper communications, diverted attention from other substantive matters, and interfered with the Court's ability to manage its docket." (*Id.*, p. 2).  The state court fined Simpson $2,000 and warned Simpson "**that further violations may result in the striking of his pleadings…**" (*Id.*) (emphasis in original).

50.     Upon information and belief, Simpson, failed to pay any of the fines assessed against him by the state court.

51.     Despite the sanctions orders, Simpson continued, repeatedly, to disobey the state court's orders prohibiting direct communications with the state court.

**THE CIVIL AND CRIMINAL CONTEMPT MOTION AGAINST SIMPSON**

52.     On May 30, 2025, Chassen moved in the State Court Action to hold Simpson in civil and criminal contempt for his repeated willful disobedience of the Receiver Order and the Enforcement Order (the "Contempt Motion") (NYSCEF Doc. Nos. 1537 – 1548).  Simpson, for 56 days from March 11, 2025 through May 13, 2025, and again for 46 days from May 24, 2025 through the end of June 2025, prevented me from performing my duties by (i) refusing to permit me access to receivership properties, (ii) expelling me from the Business Premises, (iii) changing the locks twice and, in the presence of a police officer, destroying an alarm system I installed on another receivership property and (iv) emailing a principal of the mortgage lender to one of the receivership entities, telling him not to send a payoff letter to me because Justice Cohen and I were "on the take" (*see* Movants' Joint-Post Hearing Memorandum in support of the contempt motion filed on November 18, 2025 [NYSCEF Doc. No. 2072], ¶¶ 14 -15, 17, 24-25 and the evidentiary references there provided, including the police report describing the destruction of the alarm system, NYSCEF Doc. No. 1630).

53.     Furthermore, Simpson violated the Receiver Order (NYSCEF Doc. No. 1360, p. 6) by (i) making a threatening phone call to me and (ii) sending me a threatening text message (Post-Hearing Brief [NYSCEF Doc. No. 2072], ¶ 18 and the evidentiary references there provided) and (iii) continuously sending abusive and threatening communications to me, Chassen, other parties, counsel for the parties and me, as well as to the State Court itself.

54.     Because Simpson's repeated and continuing willful disobedience of the Receiver Order and Enforcement Order prevented me from performing my duties for months, I joined Chassen's motion to hold Simpson in contempt (*see* Joinder of Receiver [NYSCEF Doc. Nos. 1549 – 1551]; Supplemental Joinder of Receiver [NYSCEF Doc. Nos. 1567 – 1569]).  The State

Court conducted an evidentiary hearing on the contempt motion over four days between late July 2025 and mid-October 2025 (*see* July 21, 2025 Hearing Tr. [NYSCEF Doc. No. 2000]; August 1, 2025 Hearing Tr. [NYSCEF Doc. No. 2051]; August 4, 2025 Hearing Tr. [NYSCEF Doc. No. 2050]; October 10, 2025 Hearing Tr. [NYSCEF Doc. No. 2052]). The movants filed their Post-Hearing Memorandum in support of the civil and criminal contempt motion on November 18, 2025 (*see* NYSCEF Doc. No. 2072). The State Court has not yet rendered its decision on the contempt motion.

**THE RECEIVER'S EFFORTS AND ACCOMPLISHMENTS TO DATE**

55. The Receiver has consummated transactions on two of the receivership properties, 225 HPR and the 550 Metro Retail Condo, following their approval by the state court. He has recently reached a settlement understanding for which he would like to seek approval for a transaction on 146 East 89th Street, and received an offer to purchase the 1640 Montauk Property for which he would like to seek approval. Those transactions and proposed transactions are detailed as follows:

a. <u>225 HPR</u>. The 225 HPR residential property was subject to a mortgage foreclosure action. I sold 225 HPR in late 2025 pursuant to an order of the state court (*see* Court Notice [NYSCEF Doc. No. 1899]; *see also* NYSCEF Doc. No. 1912). The sales proceeds paid off the mortgage loan on 225 HPR in full, resulted in the discontinuance of the foreclosure action with prejudice and released the personal guaranties of Simpson and a family member of Chassen on the mortgage debt.

b. <u>550 Metro Retail Condo</u>. The 550 Metro Retail Condo was subject to a mortgage foreclosure action. Pursuant to a stipulation of settlement approved by the Court, I delivered a deed in lieu of foreclosure to the mortgage lender's nominee, paid the New York City ("NYC")

20

and New York State ("NYS") transfer taxes on the transaction and received from the mortgage lender the executed release of Simpson and Chassen's joint personal guaranty (*see* NYSCEF Doc. Nos. 2061, 2062, 2080).  Pursuant to the stipulation of settlement, the mortgage lender is obligated to discontinue the mortgage foreclosure action with prejudice.

      c.      <u>146 East 89th Street townhouse</u>.  The 146 East 89th Street townhouse is subject to a mortgage foreclosure action commenced in January 2024.  The principal amount of the mortgage is $3.8 million, the default interest rate is 24% and the current mortgage debt is approximately $5.845 million. Based on the marketing of this vacant townhouse by the two real estate brokers approved by the state court, the value of 146 East 89th Street is substantially less than its mortgage debt. A prospective buyer recently claimed to show interest at $4.2 million, but did not make an offer.  Both Simpson and Chassen personally guaranteed the mortgage loan. I have reached a settlement understanding with the mortgage lender to take delivery of a deed in lieu of foreclosure and release the personal guaranties.  The mortgage lender will be responsible to fund the payment of NYC and NYS transfer taxes on the transaction and will assume responsibility for the liens on the property, which include mechanics' liens.

      d.      <u>The 1640 Montauk Property</u>.  The 1640 Montauk Property has been marketed by two real estate brokers approved by the state court.  The 1640 Montauk Property is the subject of a mortgage foreclosure action commenced in 2024.  Its mortgage loan in the principal amount of $1,500,000 bears default interest at 24%, or $30,000 per month (in addition to other charges and expenses of the lender).  The current payoff amount of the mortgage loan is approximately $2.2 million.  Both Simpson and Chassen personally guaranteed the mortgage loan.  The appraisal report attached to the Injunction Motion valued the 1640 Montauk Property at $2,575,000 in May 2022 (*see* Injunction Motion [ECF No. 2], Ex. G).  I have received an offer for the 1640 Montauk

Property for materially more than $2,575,000, and am continuing to negotiate with the prospective purchaser. The sale of the 1640 Montauk Property at the current offer amount or a higher amount would result in the release of the personal loan guaranties of Simpson and Chassen.

**WHEREFORE,** declarant respectfully requests that this Court deny the motion of Jeffrey Simpson, Debtor, for preliminary injunctive relief.

Dated: New York, New York
      March 17, 2026

_____
Eric M. Huebscher

FF\50559231.2