KLESTADT WINTERS JURELLER SOUTHARD
& STEVENS, LLP
Sean C. Southard, Esq.
Brendan M. Scott, Esq.
200 W. 41st Street, 17th Floor
New York, New York 10036
(212) 972-3000

SCHWARTZ LAW PLLC
Allen Schwartz, Esq.
150 Broadway, Suite 701
New York, NY 10038
(347) 460-5379

*Co-Counsel to Jared Chassen*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| JEFFREY SOLOMON SIMPSON, | : | Case No. 26-10359 (LGB) |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |
| JEFFREY SOLOMON SIMPSON, as Debtor and Debtor in Possession, | : | |
| | : | Adv. Pro. No. 26-01013 (LGB) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ERIC HUEBSCHER, as Receiver of Certain Assets of JJ Arch, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**OBJECTION OF PROPOSED INTERVENOR DEFENDANT JARED CHASSEN TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF ENFORCING AND EXPANDING THE AUTOMATIC STAY**

TO:    THE HONORABLE LISA G. BECKERMAN,
        UNITED STATES BANKRUPTCY JUDGE:

Jared Chassen ("<u>Movant</u>" or "<u>Chassen</u>"), proposed intervening defendant, and creditor and

party in interest in the above-captioned Chapter 11 case, as and for his objection to *Plaintiff's Motion for Injunctive Relief Enforcing and Expanding the Automatic Stay* [DE 2] (the "Motion"), respectfully represents:

## PRELIMINARY STATEMENT

1. In an effort to collaterally attack a state court's decisions and orders, Debtor Jeffrey Simpson (the "Debtor" or "Mr. Simpson" or "Plaintiff") moves to enforce and expand the automatic stay to apply to certain business and assets under the control of a temporary receiver appointed in the state court action captioned *Simpson v. Chassen*, Index No. 158055/2023 (N.Y. Co.) (the "Corporate Control Action"). In March 2025, upon Movant's motion and after a multi-day evidentiary hearing, the state court appointed the receiver, Eric Huebscher (the "Receiver"), and directed him to maximize the remaining equity value of corporate entities owned or controlled by JJ Arch LLC ("JJ Arch"), namely 225 HPR LLC, 1640 Montauk LLC, 1640 Motors LLC, JJ NY 550 LLC, 146 E 89 Borrower 1 LLC, 146 E 89 Borrower 2 LLC, and 146 E 89 Borrower 3 LLC (collectively, the "JJ Arch Controlled Entities"). Movant and Mr. Simpson have been litigating their respective rights and interests in relation to JJ Arch within the Corporate Control Action since 2023.

2. The business and properties owned by the JJ Arch Controlled Entities included and/or include: (1) the real property located at 1640 Montauk Highway, Water Mill, New York ("Montauk Property"), owned by 1640 Montauk LLC; (2) the business known as Rêver Motors ("Rever Motors"), owned by 1640 Motors LLC, and which had been situated on the Montauk Property pursuant to a lease with 1640 Montauk LLC; (3) the real property known as 225 Head of Pond Road in Water Mill, New York ("Head of Pond"), owned by 225 HPR LLC; (4) the real property known as 550 Metropolitan Avenue, Brooklyn, New York ("550 Metropolitan"), owned

JJ NY 550 LLC; and (5) the real property known as 146 E. 89th Street, New York, New York ("89th Street Property"), owned by 146 E 89 Borrower 1 LLC, 146 E 89 Borrower 2 LLC, and 146 E 89 Borrower 3 LLC (collectively, the "JJ Arch Controlled Properties"). The specific focus of Mr. Simpson's motion herein is a scheduled upcoming auction of items at the former business location of Rever Motors on the Montauk Property and the Receiver's ongoing efforts to sell the Montauk Property.

3.     To date, Mr. Simpson has opposed every single action taken by the Receiver. Nonetheless, despite his unceasing opposition to the Receiver since his appointment in March 2025, the Receiver has already successfully resolved the outstanding mortgage foreclosures that were pending against 225 HPR LLC and JJ NY 550 LLC by third party sales or deeds in lieu of foreclosure and released both Mr. Simpson and Mr. Chassen from related guarantor liability. The Receiver is on the verge of resolving the pending foreclosures against 1640 Montauk LLC and 146 E 89 Borrower 1 LLC, 146 E 89 Borrower 2 LLC, and 146 E 89 Borrower 3 LLC, with resolutions that would also release both Mr. Simpson and Mr. Chassen from their guarantor liability, while ensuring maximum equity value for these JJ Arch Controlled Entities.

4.     In the case of the 89th Street Property, Movant understands that the outstanding mortgage indebtedness is now approximately $1.5 million dollars greater than the value of the 89th Street Property (as determined by two attempted sales processes by reputed brokers). Default interest is accruing rapidly and Mr. Chassen and Mr. Simpson (now his bankruptcy estate) are facing a massive, and growing, deficiency judgement (presently at or exceeding approximately $1.5 million). Movant understands that over a period of months, the Receiver hired two brokers who marketed the 89th Street Property extensively but failed to obtain any buyers willing to pay any amount remotely close to the outstanding indebtedness, let alone above it. Movant, further,

understands, that the Receiver is negotiating a potential deal with the lender for a deed in lieu of foreclosure that would extinguish any guarantor liability of both Mr. Simpson and Mr. Chassen.

5.      And while there is some remaining equity in the Montauk Property, which is also in foreclosure, the default interest is accruing rapidly, leading to an erosion of approximately $30,000.00 per month in equity for every month of further delay. Thus, any delay in the Receiver's state court directed efforts (i.e., the auction of the items at the Montauk Property, followed by an equity maximizing sale of the Montauk Property to a third-party), as Mr. Simpson seeks here, only further erodes the remaining equity and further risks the prospect that Mr. Chassen and Mr. Simpson will end up saddled with a deficiency judgment for this property.

6.      Fundamentally, Mr. Simpson mismanaged the JJ Arch Controlled Entities into this distress and he seeks to stymie the Receiver's efforts to extricate the JJ Arch Controlled Entities from this distress. The state court in the Corporate Control Action appointed the Receiver because of an extensive record of misconduct that occurred after the state court had restored Mr. Simpson to interim managerial control of JJ Arch and the JJ Arch Controlled Entities in August 2023 (when both Mr. Simpson and Mr. Chassen had sought to terminate each other that month). Once restored to interim managerial control of JJ Arch in 2023, however, Mr. Simpson grossly mismanaged JJ Arch and failed to comply with his fiduciary obligations as found by Judge Mastando. He also filed a bad-faith unilateral bankruptcy for JJ Arch despite state court orders that required that he obtained Mr. Chassen's consent. And he failed to pay lease obligations, mortgage obligations, taxes, insurance, etc., leaving every JJ Arch Controlled Property in default and foreclosure.

7.      When the state court appointed the Receiver in March 2025, rather than cooperate with the Receiver and comply with the state court's order, Mr. Simpson embarked on a campaign of defiance, that included two frivolous removals of the case to federal court (leading to sanctions

4

by the federal district court), multiple 911 incidents and expulsions by Mr. Simpson of the Receiver from receivership property, a refusal to provide records or comply with court orders, and a torrent of abuse onto the Receiver. Mr. Simpson then openly boycotted the state court proceedings in the Corporate Control Action, frivolously sued the Receiver and the state court itself in federal district court alleging civil rights discrimination, and engaged in repeated efforts to thwart the Receiver and the state court proceedings. When all else failed, Mr. Simpson filed this Chapter 11 proceeding and this adversary action against the Receiver in the latest salvo to stymie the Receiver.

8.     As further detailed herein, the Court should deny Mr. Simpson's application and clarify that the Receiver is neither enjoined nor stayed from fulfilling his state court ordered directives by virtue of Mr. Simpson's personal bankruptcy filing. The automatic stay does not, and should not extend, to the JJ Arch Controlled Entities. Moreover, Mr. Simpson does not come to this Court with clean hands, and the balance of the equities do not favor him. On the contrary, they favor Movant who stands to be financially devastated if the Receiver is unable to proceed with the auction and sale, and they favor Mr. Simpson's estate (as opposed to Mr. Simpson's personal vendettas), which stands to benefit from the Receiver's efforts to mitigate or extinguish his guarantor liability and what are otherwise ever-growing creditor claims. Further, the Court should defer to the state court's rulings under basic principles of comity. Deference to these principles of comity is only made more compelling here by the extensive record of Mr. Simpson's longstanding collateral attacks on, and defiance of, the state court's orders.

### BACKGROUND

I.     **The Bankruptcy Case.**

9.     On February 19, 2026 (the "Filing Date") the Debtor filed a voluntary petition under section 301 of the Bankruptcy Code.

10. On February 20, 2026, the Debtor commenced the above-captioned adversary proceeding (the "Stay Extension AP") by the filing of a complaint against the Receiver [DE 1].

11. On the same day, the Debtor filed the Motion seeking injunctive relief and/or to enforce and expand the automatic stay in relation to the Receiver's efforts to move forward with a scheduled sale of receivership property [DE 2].

12. On March 6, 2026, Movant filed the *Motion of Jared Chassen for an Order Permitting Intervention in Adversary Proceeding Pursuant to 11 U.S.C. § 1109(B), Fed. R. Civ. P. 24, and Fed. R. Bankr. P. 7024* [DE 8], which is scheduled for a hearing on March 24, 2026 at 10:00 a.m.

**II. The Corporate Control Action and Simpson's Bad-Faith JJ Arch Bankruptcy Filing Where Judge Mastando Found that He Had Grossly Mismanaged JJ Arch**

13. Plaintiff and Movant are the two members of JJ Arch. NYSCEF Doc. No. 721, JJ Arch LLC Operating Agreement; NYSCEF Doc. No. 722, Amended JJ Arch LLC Operating Agreement.[1] The 2023 Corporate Control Action in which a receiver was appointed, involves Messrs. Simpson and Chassen's competing claims to terminate each other as members of JJ Arch.[2]

14. In August 2023, the state court entered an order that restored Mr. Simpson to

---

[1] Due to the voluminous papers involved in the Corporate Control Action, in lieu of being physically attached as exhibits, many of the documents from the action are cited to the state court record on the New York State Court Electronic Filing system ("NYSCEF") by reference to the NYSCEF docket number, as "NYSCEF Doc No. ___." "[T]he Court may take judicial notice of documents filed on this system as they are part of the public record." *Windward Bora LLC v Lungen*, 2023 U.S. Dist. LEXIS 153609, at *2, n 2 (S.D.N.Y. Aug. 29, 2023).

[2] NYSCEF Doc. No. 1, Complaint; NYSCEF Doc. No. 1070, Second Amm. Answer with Counterclaims. The Corporate Control Action also centers around longstanding state law disputes between Simpson and 608941 NJ Inc. ("Oak"), the investor member in Arch Real Estate Holdings, LLC ("AREH"). Simpson and Chassen formed JJ Arch in 2017 primarily to act as AREH's managing member, which was to manage a substantial real estate portfolio. NYSCEF Doc. No. 720, AREH Operating Agreement.

managerial control of JJ Arch, subject to, among other things, Mr. Chassen's membership and consent rights to major decisions. NYSCEF Doc. No. 36, Order Regarding Interim Operating Procedures.

15. Despite being directed to cooperate in good faith, within days of being restored to managerial control, on September 1, 2023, Mr. Simpson attempted to terminate Mr. Chassen. In orders entered in September and November 2023, the state court restored Mr. Chassen and barred either member from terminating the other without prior court permission. NYSCEF Doc. No. 86, September 2023 TRO; NYSCEF Doc. No. 419, November 2023 Preliminary Injunction. The state court granted Mr. Simpson a preliminary injunction in September 2023 in which it incorporated the August 2023 Interim Order and September 2023 TRO. NYSCEF Doc. No. 159, September Preliminary Injunction.[3]

16. In April 2024, Mr. Simpson removed the Corporate Control Action to federal bankruptcy court after he filed a Chapter 11 bankruptcy petition on behalf of JJ Arch in March 2024 as its purported "sole member" and without Mr. Chassen's consent. NYSCEF Doc. Nos. 629, 630, 631, 632, Notice of Bankruptcy and Correspondence; NYSCEF Doc. No. 635-636, Notice of Removal. Judge Mastando found that Mr. Simpson's removal was an act of forum shopping. *See In re JJ Arch LLC*, Nos. 24-10381 (JPM), 24-1335 (JPM), 2024 Bankr. LEXIS 1347, at *33-47 (Bankr. S.D.N.Y. June 10, 2024); *id.* at *44, n 24 (citing to and noting that "[m]any of Mr. Simpson's emails indicate a certain displeasure for Mr. Chassen . . . and—perhaps most notably— Justice Cohen's Interim Orders.").

17. On October 11, 2024, Judge Mastando dismissed the JJ Arch bankruptcy case entirely because it found that Mr. Simpson had filed it in subjective and objective bad faith and

---

[3] *See also* NYSCEF Doc. No. 224, Sept. 29, 2023 Hr. Tr. at 54:5-55:4; *See also* NYSCEF Doc. No. 128, Sept. 15, 2023 Hr. Tr.; NYSCEF Doc. No. 83, Sept. 11, 2023, Hr. Tr.

then grossly mismanaged JJ Arch during the bankruptcy proceeding and failed to fulfill his fiduciary obligations. *In re JJ Arch LLC*, 663 B.R. 258 (Bankr. S.D.N.Y 2024).

18. After the dismissal of the bankruptcy, in October 2024, Mr. Chassen moved, among other things, to hold Mr. Simpson in contempt of the state court's prior orders and for a preliminary injunction enforcing his removal as member of JJ Arch, with Mr. Chassen, as the remaining member, taking managerial control in his stead. NYSCEF Doc. Nos. 711-757, 942-943.[4]

19. In December 2024, Mr. Chassen moved within the Corporate Control Action for a temporary receiver over the JJ Arch Controlled Entities and all the assets and properties owned by the JJ Arch Controlled Entities. NYSCEF Doc. Nos. 994-1010.

20. By way of background, Messrs. Chassen and Simpson had purchased the JJ Arch Controlled Properties together which they owned and managed through JJ Arch and the JJ Arch Controlled Entities beginning in or about 2022. For the avoidance of doubt, the JJ Arch Controlled Entities were independent of AREH. Rather, JJ Arch as sole member of (a) 1640 Montauk LLC, owned the Montauk Property, (b) 1640 Motors LLC operated Rever Motors on the Montauk Property, (c) JJ NY 550 LLC owned 550 Metropolitan, and (d) 225 HPR LLC owned Head of Pond. JJ Arch, with outside investors, also formed three other entities, 146 E 89 Borrower 1 LLC, 146 E 89 Borrower 2 LLC, and 146 E 89 Borrower 3 LLC, to purchase the 89th Street Property,

---

[4] The state court denied Mr. Chassen's request for a temporary restraining order. NYSCEF Doc. No. 934, Nov. 20, 2024 Decision and Order; NYSCEF Doc. No. 941, Nov. 20, 2024 Signed Order to Show Cause. The part of the motion seeking a preliminary injunction was later withdrawn on March 13, 2025, but the contempt motion was set to proceed. NYSCEF Doc. No. 1363, Mar. 14, 2025 So-Ordered Letter. Though subsequently further briefed by Mr. Chassen, (NYSCEF Doc. No. 1373-1379), including based upon Mr. Simpson's deposition and hearing testimony regarding his bankruptcy filing as purported "sole member," (NYSCEF Doc. Nos. 1373 and 1374), the contempt motion was later denied without prejudice on June 13, 2025 because of Mr. Simpson's subsequent removal of the action to federal court. NYSCEF Doc. No. 1561, June 13, 2025 Decision and Order.

with JJ Arch serving as the managing member. *See* NYSCEF Doc. No. 1347, Post-Hearing Letter; NYSCEF Doc. No. 1275, Chassen Direct Testimony Affirmation.[5]

21.　　At the time Mr. Chassen sought to impose the receivership in the Corporate Control Action, each of the aforesaid properties was in default or foreclosure, with Mr. Chassen named a guarantor defendant with full recourse liability. *See e.g.*, NYSCEF Doc. No. 1213, 89th Street Foreclosure Complaint; NYSCEF Doc. No. 1229, 550 Metropolitan Avenue Complaint; NYSCEF Doc. No. 1272, Montauk Property Complaint. Moreover, each of the properties was in a highly distressed condition because of Mr. Simpson's gross mismanagement. *See* NYSCEF Doc. No. 1347, Post-Hearing Letter; NYSCEF Doc. No. 1275, Chassen Direct Testimony Affirmation.

22.　　The significant financial distress of the JJ Arch Controlled Entities (and the JJ Arch Controlled Properties) was evidenced by the fact that Mr. Simpson had failed to file taxes since 2021, failed to pay employee payroll taxes, grossly mismanaged JJ Arch LLC as adjudicated by the United States Bankruptcy Court, and disobeyed state court orders that required him to honor Mr. Chassen's consent rights and give Mr. Chassen account viewing access and books and records. *See* NYSCEF Doc. No. 1347, Post-Hearing Letter; NYSCEF Doc. No. 1275, Chassen Direct Testimony Affirmation.

---

[5] *See* NYSCEF Doc. No. 1172, 225 HPR LLC Operating Agreement; NYSCEF Doc. No. 1173, 1640 Montauk LLC Operating Agreement; NYSCEF Doc. No. 1175, 1640 Motors Articles of Organization; NYSCEF Doc. No. 1179, 146 E 89 Borrower 1 LLC Operating Agreement; NYSCEF Doc. No. 1180, 146 E 89 Borrower 2 LLC Operating Agreement; NYSCEF Doc. No. 1181, 146 E 89 Borrower 3 LLC Operating Agreement; NYSCEF Doc. No. 1179, 89th Street Property Deed; NYSCEF Doc. No. 1183, 89th Street Property Note; NYSCEF Doc. No. 1184, 89th Street Mortgage; NYSCEF Doc. No. 1185, 89th Street Guaranty; NYSCEF Doc. No. 1186, Montauk Property Note; NYSCEF Doc. No. 1187, Montauk Property Mortgage; NYSCEF Doc No. 1189, Montauk Property Guaranty; NYSCEF Doc. No. 1190, 550 Metropolitan Note; NYSCEF Doc. No. 1191, 550 Metropolitan Mortgage; NYSCEF Doc. No. 1192, 550 Metropolitan Mortgage.

23.     In addition to its unpaid payroll taxes, Rever Motors also owed hundreds of thousands of dollars in unpaid rent to 1640 Montauk LLC, whose property was consequently in foreclosure, with the lender itself seeking the appointment of a receiver in the pending foreclosure proceeding in Suffolk County Supreme Court. NYSCEF Doc. No. 1374, Simpson Dep. Tr. at 91:4-91:14; NYSCEF Doc. No. 1275, Chassen Direct Testimony Affirm. at ¶ 12; NYSCEF Doc. No. 1098, Suffolk County Decision and Order.

24.     And though Mr. Simpson deprived Mr. Chassen of any visibility into the business beginning in August 2023—in defiance of the very order that restored Mr. Simpson to managerial control—Mr. Chassen was the recipient of IRS notices that sought to impute unpaid taxes at Rever Motors by Mr. Simpson to Mr. Chassen. NYSCEF Doc. No. 1209, IRS Notices. Indeed, Rever Motors has never earned a profit, (NYSCEF Doc. No. 1374, Simpson Dep. Tr. at 156:13-14), and has at least $272,449 in unpaid payroll tax liabilities to the IRS. *See e.g.*, NYSCEF Doc. No. 1753, Tax Warrants and Notice of Intent to Levy; NYSCEF Doc. No. 1837, Receiver's Third Report.

25.     Moreover, before the state court granted the receiver motion, even Mr. Simpson apparently recognized the dire state he left JJ Arch in, and in a letter and a proposed stipulation filed on NYSCEF he advocated for the sale of all the real properties that were ultimately put into receivership. NYSCEF Doc. No. 1350, Proposed Stipulation; *See also* NYSCEF Doc. No. 1176 Proposed Plan of Reorganization (seeking to liquidate JJ Arch LLC as purported sole member). As Mr. Simpson's then-lawyer put it, "the assets are on fire itself." NYSCEF Doc. No. 1434, March 5, 2025 Hr. Tr. at 20:2-9-22:7.

26.     In every practical sense, Rever Motors was not, in fact, a functioning business. It had been unable to pay its lease payments for over a year, and the Montauk Property that houses it is in foreclosure accruing default interest that is rapidly eating away at any remaining equity in

the same. The Receiver arrived at Rever Motors to find "no employees, there was no -- when I got there, there was no ongoing operations." NYSCEF Doc. No. 2051, Aug. 1, 2025 Hr. Tr. at 44:10-11. The Receiver's findings upon his arrival at Rever Motors are amply documented in his reports and his testimony in connection with the contempt hearing. As discussed below, Mr. Simpson has still not cooperated with the Receiver to provide him with books and records and information, and the Receiver has discovered hundreds of thousands of dollars in liability to the IRS for failure to forward payroll taxes to the IRS. *See generally* NYSCEF Doc. No. 2145, Receiver's Memo of Law in Opp (citing to the Receiver's testimony and reports and detailing the utterly dire state of Rever Motors).

### III. After the Bankruptcy Dismissal, the State Court Appoints a Receiver over the JJ Arch Controlled Entities

27. On March 11, 2025, the state court, after a two-day evidentiary hearing, appointed a temporary receiver, Eric Huebscher (who had been the sub-chapter 5 trustee during the JJ Arch bankruptcy) over the JJ Arch Controlled Entities. NYSCEF Doc. No. 1360, Receiver Order.[6] The

---

[6] In the leadup to the hearing, Simpson sent the state court abusive emails despite being directed not to send such emails to the Court. *See eg.* NYSCEF Doc. Nos. 1248-1249. On February 9, 2025, Simpson sent an email directly to the state court in which he asserted that this:

> is a court of non-competent jurisdiction, who has been biased since the first day and has made rulings that are not at all practical or thoughtful or considerate to anything or anyone here especially when you can't even remember what it is you offered in a prior order or transcript. So you may not like my tone and you may criticize me and tell me that I'm not being proper but again if someone took from you what's been taken for me I would love to see what your tone will be like . . . All right reserved and yes I am copying every possible avenue of the NY court system that I know because there's no justice here. I will forward along later to the Southern District and make sure that all the judges who have touched this case have also seen what's going on here because it is not lawful.

NYSCEF Doc. No. 1132, Simpson Feb. 9, 2025 Email to Justice Cohen.

Simpson's behavior towards counsel in the leadup to the hearing was also extremely abusive. For example, Simpson sat for a deposition on February 13, 2025, during which he lobbed

Receiver Order was supported by clear and convincing evidence showing that Mr. Simpson had failed to pay taxes since 2022, caused all the subject properties to go into default or foreclosure, with Mr. Chassen named as a defendant guarantor, left properties vacant and unattended for over a year, diverted JJ Arch assets to himself rather than pay debt servicing and leases, and engaged in a longstanding pattern of defiance of court orders and unilateral actions in disregard of Mr. Chassen's rights as a member of JJ Arch as provided by prior court orders.[7]

28. The Receiver Order removed managerial control from Mr. Simpson and gave the Receiver sole and complete control over JJ Arch's managerial and membership interests in the JJ Arch Controlled Entities, the "JJ Arch Controlled Entities' funds, assets, properties, records, and bank accounts," including each of the JJ Arch Controlled Properties. NYSCEF Doc. No. 1360, Receiver Order. The Receiver was appointed to manage and maximize the value of the JJ Arch Controlled Entities. *Id.* The Receiver Order required Mr. Simpson to give the Receiver all relevant documentation and barred any interference with the Receiver. *Id.* at 5-6.

IV. **Simpson Purports to Remove the Corporate Control Action to Federal District Court and Defies the Receiver Order**

29. On March 19, 2025 and March 20, 2025, though represented by counsel, (NYSCEF Doc. No. 1038, Jan. 7, 2025, Notice of Appearance)), Mr. Simpson attempted to remove the action

---

abuse at counsel: "You're scum. Yeah, scum lying garbage you are. Keep going. Keep going. You lied to the Court literally. Keeping lying. Keep going . . . I can't believe the bar gives you a license." NYSCEF Doc. No. 1374, Simpson Dep. Tr. at 115:17-25. Simpson called counsel a "disgusting lawyer," *id.* at 322:20-10, and told him that "I think you're a lying, cheating thief." *Id.* at 280:5-12. Mr. Simpson also called counsel a "disgusting pig," and said ominously "You've lied to the Court every single time. Go ahead. That's okay. We'll have an investigation of you of a different kind." *Id.* at 183:3-24.

[7] *See, e.g.,* NYSCEF Doc. No. 1347, Post-Hearing Letter; NYSCEF Doc. No. 1275, Chassen Direct Testimony Affirmation; NYSCEF Doc. No. 1166, Peldman Direct Testimony Affirmation; NYSCEF Doc. No. 1165, Nicolardi Direct Testimony Affirmation; NYSCEF Doc. No. 1162, Gandhi Direct Testimony Affirmation; NYSCEF Doc. No. 1346, Feb. 25, 2025 Hr. Tr.; NYSCEF Doc. No. 1371, Feb. 28, 2025; Hr. Tr.; NYSCEF Doc. No. 1434, Mar. 5, 2025 Hr. Tr.

to federal court by e-filing a purported notice of removal via his own NYSCEF account credentials. NYSCEF Doc. No. 1380; NYSCEF Doc. No. 1381; NYSCEF Doc. No. 1389.

30. Thereafter, on March 20, 2025, Mr. Simpson e-filed multiple letters and filings to the Court using his NYSCEF account credentials, which were notable for their disrespect to the state court. NYSCEF Doc. No. 1384, Mar. 20, 2025 Letter to Court; NYSCEF Doc. No. 1389, March 20, 2025 Letter to Court; NYSCEF Doc. No. 1406, March 24, 2025 Letter to Court.

31. After filing the removal, Mr. Simpson prevented the Receiver from entering Rever Motors, leading to a police incident. NYSCEF Doc. No. 2000, July 21, 2025 Hr. Tr. at 47:7-12; NYSCEF No. 2051, August 1, 2025 Hr. Tr. at 59:9-14 (Simpson was "screaming at me at the top of his lungs," and called the Receiver "scumbag among other vulgarities."). Mr. Simpson asserted that the Receiver did not have any right to be at Rever Motors because the Receiver Order was dismissed.[8]

32. On April 22, 2025, the Receiver made another attempt to enter Rever Motors, this time with an armed guard to protect himself from potential violence by Mr. Simpson but was unable to gain entry. NYSCEF Doc. No. 2000, July 21, 2025 Hr. Tr. at 50:21-52:6. On April 22, 2025, Mr. Simpson called the Receiver directly telling him to stand down. *Id.* at 52:7:14. He also sent an email to the Receiver on April 22, 2025, copying the Court, in which he told the Receiver and the other recipients, inter alia, that he had just called the Receiver on the phone and demanded that he not "step foot" on his properties. NYSCEF Doc. No. 1621, Simpson Apr. 22, 2025 Email; *see also* NYSCEF Doc. No. 2000, July 21, 2025 Hr. Tr. at 54:13-21. This was followed up by a text message from Mr. Simpson to the Receiver in which he told the Receiver, among other things,

---

[8] NYSCEF Doc. No. 1620, Mar. 24, 2025 Police Report; NYSCEF Doc. No. 2000, July 21, 2025 Hr. Tr. at 47:24; NYSCEF No. 1406, Mar. 24, 2025 Letter; NYSCEF No. 1633, Simpson April 8, 2025 Email to Receiver.

"You are not to step foot on one of my properties ever again. You are nothing but a disgusting human that's a money hungry pig . . . ." NYSCEF Doc. No. 1622, Text Message; *See also* NYSCEF Doc. No. 2000, July 21, 2025 Hr. Tr. at 68:6-70.

33.     Mr. Simpson interfered with the Receiver's exercise of his duties with respect to other JJ Arch Controlled Properties and refused to provide him with information. NYSCEF Doc. No. 2072, Post-Hearing Memo for Contempt Motion at ¶¶ 19-25, 27-29 (citing evidence).

34.     On April 25, 2025, the United States District Court  remanded the Corporate Control Action because Mr. Simpson failed to pay the filing fees. *Simpson v Chassen*, 1:25-CV-2372 (LTS), 2025 WL 1279005, at *1 (S.D.N.Y. Apr. 25, 2025), *appeal dismissed* (June 23, 2025), *mot for relief from judgment denied*, 1:25-CV-2372 (LTS), 2025 WL 1916137 (S.D.N.Y. June 3, 2025).

### V.     After the First Remand, the State Court Enters an Order Enforcing the Receiver Order

35.     On May 12, 2025, the Court issued an order compelling Mr. Simpson to comply with the Receiver Order (the "Enforcement Order"). NYSCEF Doc. No. 1508. The Enforcement Order, among other things, barred Mr. Simpson from entering any of the JJ Arch Controlled Properties under receivership, from transacting any business of any of the JJ Arch Controlled Entities under receivership, from harassing the Receiver, and from interfering with the Receiver's exercise of his duties. *Id.*

36.     It also compelled Mr. Simpson to provide thirteen categories of documents to the Receiver including (1) all books and records of the JJ Arch Controlled Entities; (2) an inventory of all assets belonging to the JJ Arch Controlled Entities, including a list of all the vehicles at Rever Motors at any time since August 16, 2023; (3) the original certificates of title for each vehicle owned by any JJ Arch Controlled Entities; (4) a list of all employees at the JJ Arch Controlled

Entities from August 16, 2023 and all payroll records; (5) all tax returns and government correspondence relating to the JJ Arch Controlled Entities; (6) all banking records for the JJ Arch Controlled Entities; (7) all books, logs, spreadsheets, and documents detailing the transactions at the JJ Arch Controlled Entities; (8) keys and codes required to access the properties owned by the JJ Arch Controlled Entities; (9) all appraisals, broker opinions, or other valuations of the assets under receivership; (10) all loan documents in which any JJ Arch Controlled Entity was a party or that related to the JJ Arch Properties; (11) all contracts in which the JJ Arch Controlled Entities are a party; (12) the location of all assets belonging to the JJ Arch Controlled Entities; and (13) all other documents requested by the Receiver to exercise his duties. *Id.*

37. After the Enforcement Order, the Receiver was able to take possession of Rever Motors for the first time on May 14, 2025, 56 days after his appointment. NYSCEF Doc. No. 2000, July 21, 2025 Hr. Tr. at 154-155.

**VI.   Simpson Removes the Corporate Control Action Again and Expels the Receiver from Rever Motors**

38. On May 15, 2025, Mr. Simpson e-filed screenshots to the Court via his own NYSCEF account credentials showing that a new removal case had been opened in federal court and a judge assigned. NYSCEF Doc. No. 1517-1518. On May 21, 2025, after Mr. Simpson's May 15, 2025 posting of the then opened federal docket, his counsel filed an *ex parte* order with the Court, and on May 23, 2025, a proposed order to show cause. NYSCEF Doc. Nos. 1521-1526. On May 23, 2025, the Court issued a notice stating that the Court could not act since on "May 15, 2025, Mr. Simpson (pro se) filed a Notice of Removal (NYSCEF Doc. 1517-1518) which confirms that this case has been removed to federal court and a docket number and judge(Swain, CJ) have been assigned." NYSCEF Doc. No. 1527, Court Notice.

39. Within a handful of hours, Mr. Simpson's counsel emailed the parties that the Court

Notice had "divested the Receiver of authority," "[a]ll Receivership Orders are unenforceable," and Mr. Simpson was "on his way to safeguard and take control of the assets immediately. If the keys are not readily available, my client will be changing locks as soon as this evening." NYSCEF Doc. No. 1649, May 23, 2025, 7:00 p.m. email (emphasis in original); *See also* NYSCEF No. 1638.

40. Upon receipt of this e-mail, counsel for the parties advised Mr. Simpson's counsel that the state court orders remained in effect upon removal, including the Receiver Order that was in place since March 2025. *Id.* Later that evening, his counsel wrote the parties indicating that Mr. Simpson had gone to Rever Motors, and that he claimed "doors were left unlocked," vehicle parts and tools missing and the basement ransacked. NYSCEF Doc. No. 1649, May 23, 2025, 11:11 p.m. email.

41. Mr. Simpson changed the locks at Rever Motors. NYSCEF Doc. No. 2000, July 21, 2025 Hr. Tr. at 99, 115 (testifying that locks had been changed); *see also* NYSCEF Doc. No. 1655, June 27, 2025 Hr. Tr. at 14:3-6 (counsel admitting that Simpson was exercising "possession of Rever" insofar as he was attempting "to follow the requests of certain customers, like the ones in the affidavits, um, to try and get them their cars back, or see if they could be finished."); *id.* at 47:13-14 (He went to "retrieve his property, and also to secure it. He locked it when he went there."); *id.* at 50:16-17 ("In my last conversation with Mr. Schwartz, we offered up the keys."); *id.* at 62:9-11 ("And we have every intention of renewing our proposal to, and I expect it to be taken, to give back the keys to the receiver.").

42. Mr. Chassen visually confirmed that on May 24, 2025, Mr. Simpson had taken control of Rever Motors and was on site and was there on and off until June 30, 2025. NYSCEF Doc. No. 2052, Oct. 10, 2025 Hr. Tr. at 107:13-9. Mr. Chassen saw Mr. Simpson on site with the

16

garage bays open, and "it looked like an active business." *Id.* at 107:20-23; *id.* at 108:5-9. Mr. Chassen saw more than 15 cars parked by Mr. Simpson's home and in all four of Mr. Simpson's open garages located at his residence, most of which he knew to be Rever Motors cars. *Id.* at 108:10-20. He also saw the Rever Motors tow truck parked there. *Id.* at 108:21-23. Mr. Chassen also saw him towing vehicles from Rever Motors to his Water Mill home. *Id.* at 93:18-94:12.

**VII. The District Court Grants an Expedited Remand and Sanctions Simpson**

43. On May 29, 2025, the United States District Court granted an expedited remand of the action. NYSCEF Doc. No. 1642, May 29, 2025 Memorandum Opinion and Order; *see also* NYSCEF Doc. No. 1654, Emergency Motion. On May 30, 2025, Mr. Chassen filed an order to show cause seeking, inter alia, to hold Mr. Simpson in contempt (NYSCEF Doc. Nos. 1537-1548), joined by the Receiver in part, (NYSCEF Doc. No. 1549-1551), and which was signed by the Court on June 10, 2025 and set for hearing on June 27, 2025. NYSCEF Doc. No. 1557, OSC.

44. On June 27, 2025, the United States District Court sanctioned Mr. Simpson for filing a frivolous removal to federal court and enjoined him from further removals without the District Court's prior permission. *Simpson v Chassen*, 25-CV-4004 (JMF), 2025 WL 1784931, at *2 (S.D.N.Y. June 27, 2025). In issuing an injunction, the District Court found that "Simpson's vexatious history of litigation is evidenced by his three baseless attempts to remove this action to federal court," and "[c]oupled with his vexatious conduct in state court" led the court "to believe that Simpson used the removals as a vehicle to defy the [state court's] orders." *Id.* (internal citations and quotations omitted).

**VIII. After Remand, Simpson's Continues to Defy the Receiver Order**

45. Mr. Simpson continued to send the Receiver abusive communications even after the remand, and his counsel continued to demand that the Receiver give Mr. Simpson control of

all receivership assets. *See e.g.*, NYSCEF Doc. No. 1639, June 3, 2025 Email; NYSCEF Doc. No. 1640, June 9, 2025 Email; NYSCEF Doc. No. 1641, June 9, 2025 Email; NYSCEF Doc. No. 1974, Sept. 27, 2025 Email; NYSCEF Doc. No. 1977, Sept. 26, 2025 Email ("corrupt receiver or pretend to be receiver"); NYSCEF Doc. No. 1976, Sept. 29, 2025 Email (calling receiver "crooked" and asserting "conspiracy with the judge and . . . collusion with you and Chassen . . ."); NYSCEF Doc. No. 1973, Sept. 26, 2025 Email; NYSCEF Doc. No. 1951, Sept. 26, 2025 Email.

46.     Mr. Simpson never provided the information required by the Receiver Order and Enforcement Order. NYSCEF Doc. No. 2050, Aug. 4, 2025 Hr. Tr. at 84:24-87:14; 88:16-90:18. Thus, he failed to provide the requested historical payroll records or the list of past employees. NYSCEF Doc. No. 2000, July 21, 2025 Hr. Tr. at 33:24-35:16; NYSCEF Doc. No. 2050, Aug. 4, 2025 Hr. Tr. at 77-78:4. Historical payroll records were especially important in order for the Receiver to learn if Rever Motors had workers' compensation and NYS disability insurance coverage, and to resolve the IRS levies he discovered when he entered Rever Motors on June 30, 2025, which levies were imposed, inter alia, for failure to remit to the IRS withheld employee payroll taxes. *Id.*; *see also id.* at 58:10-72:4; NYSCEF Doc. No. 1753, Tax Levies and Correspondence.

47.     Mr. Simpson failed to provide the Receiver with access to Quickbooks. NYSCEF Doc. No. 2051, Aug. 1, 2025 Hr. Tr. at 90:22-93:4; 97:9-21; 106:13-18. NYSCEF Doc. No. 2050, Aug. 4, 2025 Hr. Tr. at 29:19-24; 81:10-17.

48.     Mr. Simpson provided the Receiver with username and passwords that didn't work. NYSCEF Doc. No. 2051, Aug. 1, 2025 Hr. Tr. at 106:23-9. Most of the information the Receiver requested in his May 2025 communications regarding Rever Motors to Mr. Simpson was not

produced as of the date of the close of the Receiver's testimony. NYSCEF Doc. No. 2050, Aug. 4, 2025 Hr. Tr. at 83:24-90:18.

49. Mr. Simpson failed to provide the Receiver with a complete listing of the vehicles located at Rever Motors since August 16, 2023 and the whereabouts of the vehicles missing from Rever Motors for which the Receiver found certificates of title at Rever Motors. NYSCEF Doc. No. 2000, July 21, 2025 Hr. Tr. at 26:25-29:24; *id.* at 31:8-33:23. Mr. Simpson failed to provide the Receiver with the JJ Arch Controlled Entities' correspondence with the IRS and tax information. *Id.* at 35:18-37:2 (failed to provide correspondence with IRS or other taxing authorities or tax information).

50. Mr. Simpson failed to provide the Receiver with a record of books, logs, spreadsheets, and other documents detailing the transactions of, and funds and assets owned by, the JJ Arch Controlled Entities, which would be expected to exist. *Id.* at 37:3-40:15. Mr. Simpson failed to provide the Receiver with banking records. *Id.* at 41:5-25. Mr. Simpson failed to provide the Receiver with keys to the properties owned by the JJ Arch Controlled Entities. *Id.* at 42:1-44:8.

51. Though Mr. Simpson has repeatedly claimed that he lost access to AREH's documents, the AREH Dropbox has not had JJ Arch information added to it since 2023. NYSCEF Doc. No. 2052, October 10, 2025 Hr. Tr. at 66:24-67:15. Mr. Simpson was in sole control of the JJ Arch Controlled Entities from 2023 until the appointment of the Receiver. *id.* at 99:16-100:17 (books and records are a "live thing."). Mr. Simpson also admitted at his deposition that he was operating Rever Motors since August 2023 and that Rever Motors had books and records. NYSCEF Doc. No. 1644, Simpson Feb. 13, 2025 Dep. Tr at 41:2-41:19 (admitting that he was managing Rever Motors); *id.* at 155:5-156:14 (testifying that Rever Motors had sold 40, 50, 30 cars in 2024, though it had not earned a profit); *id.* at 164:22-166:10 (testifying that Rever Motors

had 8 employees in February 2025); *id.* at 31:6-32:3 (testifying that consultant was working "through the books and records to generate, you know, updates as much as possible Quickbooks . . ."); *id.* at 41:5-41:13 (admitting to possession of payroll reports).

IX.     **Before Filing Bankruptcy, Simpson was Facing a Fully Submitted Civil and Criminal Contempt Motion for his Defiance of the Receiver Order and Contempt Order After a Multi-Day Evidentiary Hearing**

52.     Prior to filing his personal bankruptcy, Mr. Simpson was facing a fully submitted civil and criminal contempt motion for his long-standing defiance of the Receiver Orders, following a multi-day evidentiary hearing.[9] While the motion was being heard, Mr. Simpson engaged in repeated acts of defiance of other direct state court orders that led to multiple sanctions orders. NYSCEF Doc. No. 1847, September 24, 2025 Order; NYSCEF Doc. No. 1851, September 29, 2025 Order; NYSCEF Doc. No. 1998, October 8, 2025 Order; NYSCEF Doc. No. 2157, December 5, 2025 Order.[10] Mr. Simpson also refused to appear at the contempt hearing. NYSCEF Doc. Nos. 2126-2127, October 2025 Emails from Simpson to Court; NYSCEF Doc. No. 2052, October 10, 2025 Hr. Tr.

53.     Mr. Simpson was also facing a fully submitted default judgment motion and motion to strike his pleadings for his open boycott of the state court proceedings, which included his

---

[9] *See* NYSCEF Doc. Nos. 1537-1558, 1567-1569, 1586, 1591-1597, 1600, 1603-1606, 1608-1609, 1611-1678, 1683, 1688-1693, 1705-1760, 1811-1815, 1817-1819, 1842-1844, 1860-1897, 1918-1921, 1984-1987, 2000, 2005, 2050-2052, 2056, 2072, 2073, 2075.

[10] Many of Mr. Simpson's emails have been subsequently filed on the NYSCEF docket at NYSCEF Doc Nos. 1860-1897, 1909-1911, 2126-2134, 2150, 2152-2153, 2179-2185. Mr. Simpson himself posted many such emails to NYSCEF and filed a letter to the state court where he said that in his view "we do not have a Court or a Judge on this Case . . ." NYSCEF Doc. Nos. 1929-1983. Mr. Simpson, unsurprisingly, has never paid any of the fines in those orders despite being ordered to do so. The last order warned Mr. Simpson that further defiance could lead to the striking of his pleadings. NYSCEF Doc. No. 2157. Demonstrating that he is undeterred by such warnings or such consequences, after the fourth sanctions order, Mr. Simpson continued to send such emails and continued to defy the orders *See e.g.*, NYSCEF Doc. Nos. 2239-2248.

longstanding refusal to participate in discovery. NYSCEF Doc. Nos. 2230-2255, 2322-2327, 2334-2343; NYSCEF Doc. Nos. 2258-2264.

54.     Since approximately October 2025, Mr. Simpson has repeatedly told the state court in his email correspondence that he is boycotting these and other related proceedings. *See e.g.*, NYSCEF Doc Nos. 2126-2127 (informing Court that "I am not participating in anything regarding a court hearing with you as it's adjudicator, not happening."); NYSCEF Doc. No. 2134 ("Unless I'm forced to by someone under the law (with competent jurisdiction) I will not present myself in front of a disastrous abomination of any type of justice system that occurs in the courtroom of Judge Joel Cohen."); NYSCEF Doc. No. 2150 ("I'm going to copy the honorable Joel Cohen. His rules don't matter anyway he makes them up as he goes and he breaks the CPLR rules on a daily basis."); NYSCEF Doc. No. 2152 ("[M]y Fed removal was money good so no you had no authority and any authority, you have when you broke the law. You break the law every day in this courtroom on this case I'm sure you do it elsewhere too."); NYSCEF Doc. No. 2179 ("Go ahead with your sanctions there will be a lawsuit that will bring this court to the federal court by Monday for its horrific acts of extreme prejudice, bias, discrimination, negligence of reporting criminal acts and much more to be followed. Take up your sanctions there. as I said many moons ago I will not present myself in front of a corrupt / . judge court ever again."); *See also* NYSCEF Doc. Nos. 2239-2248; NYSCEF Doc. Nos. 1860-1897, 1909-1911, 2126-2134, 2150, 2152-2153, 2179-2185; NYSCEF Doc. Nos. 1923-1983.

55.     Shortly before he filed this personal chapter 11 bankruptcy, Mr. Simpson filed three frivolous lawsuits under 42 U.S.C. § 1983 against Justice Cohen in federal district court, as well as a federal civil rights case against the temporary receiver, and various counsel, in a failed effort to stop the state court proceedings and the Receiver. *Simpson v. New York State Unified Court*

*System, et. al.*, Civ. No. 1:26-cv-00110(LTS) (S.D.N.Y.); *Simpson v. Cohen et. al.*, Civ No. 1:26-cv-00193(LTS) (S.D.N.Y.); *Simpson v. Cohen et. al.*, Civ. No. 1:26-cv-00130(LTS) (S.D.N.Y.); *Simpson v. Wilson et. al.*, Civ. No. 2:26-cv-00125(SJB)(ARL) (E.D.N.Y.).

**X.      The Harm to Chassen from any Stay or Injunction as to the Receiver**

56.      As detailed above, Mr. Chassen is a guarantor of the JJ Arch Controlled Entities' mortgages, and a named guarantor-defendant in the foreclosure actions that are still pending against these entities.[11] To Mr. Chassen's knowledge, the 89th Street Property is already approximately $1,500,000.00 underwater (that is the amount of the debt is greater than the remaining equity by $1.5 million), with Mr. Chassen's guaranty exposure increasing with each passing month of default interest accruals. 1640 Montauk is accruing default interest at the rate of approximately $30,000.00 per month. Without the Receiver's being able to effectuate the sales or other dispositions of the properties, the loans will continue to accrue default interest such that Mr. Chassen will not only lose all remaining equity but will face increased liability on his guaranty of the mortgage.

57.      Mr. Simpson has a different calculus. He has opposed every action taken by the Receiver, even when it inures to his own benefit. For example, the Receiver was able to enter into a transaction with the lender of the real property located at Metropolitan Avenue Property whereby the lender was willing to accept a deed in lieu of foreclosure and release both Messrs. Chassen and Simpson from their personal guaranties. Despite the property having no equity and being deeply underwater, and facing accruing guaranty liability, Mr. Simpson opposed the transaction. NYSCEF Doc. No. 2061-2062, Receiver's Letter Application; NYSCEF Doc. No. 2070, Simpson

---

[11]  The Receiver successfully resolved the foreclosures of 550 Metropolitan and Head of Pond by a third-party sale in the case of Head of Pond, and a deed in lieu of foreclosure in the case of 550 Metropolitan.

Letter Opposition; NYSCEF Doc. No. 2071, Receiver's Letter Reply; NYSCEF Doc. No. 2074, Chassen Letter in Support. Mr. Simpson, presumably knowing that he would eventually be filing a personal bankruptcy, was willing to incur this guarantor liability and let the property be lost to foreclosure rather than obtain guaranty relief that would inure to his economic benefit.

58.     As detailed in the Receiver's reports, Mr. Simpson has left Rever Motors and the Montauk Property in which it is housed in a dire condition, with tax levies for unpaid payroll taxes amounting to hundreds of thousands of dollars, and a pending foreclosure. NYSCEF Doc. No. 1528, First Receiver Report; NYSCEF Doc. No. 1680-1681, Second Receiver Report; NYSCEF Doc. No. 1700, Supplement to Second Receiver Report; NYSCEF Doc. No. 1837, Third Receiver Report; NYSCEF Doc. No. 2145, Receiver's Memorandum of Law in Opposition to Motion to Stay Receivership with Respect to Rever Motors; NYSCEF Doc. No. 2196, Decision and Order. Rather than support the Receiver's attempts to repair this damage, for the past year Mr. Simpson has done everything in his power to thwart the Receiver.

59.     When the Receiver sought to auction property at Rever Motors, a sale that would allow the Receiver to potentially be able to file tax returns for the business and pay back the IRS, Mr. Simpson was directed by the state court to visit the property to identify any property that belonged to him personally within 14 days of the state court's December 23, 2025 order so that he might protect the rights he was asserting. NYSCEF Doc. No. 2198, Order Approving Auction (the "Sale Order"). But despite this opportunity, both he and his counsel refused to take these basic steps to identify property, seemingly preferring to hold onto this manner of argument. NYSCEF Doc. No. 2221, 2222, 2223 (Letter to Court attaching emails seeking to arrange walk through, as well as Mr. Simpson's voice message in response to Mr. Bunin, the receiver's counsel, in which he stated:

Marty, this is Jeff Simpson. As I said, Ben is sidelined. You will be talking to me and only me. And if you think you're gonna touch any piece of my property, the police will be involved immediately. So if you think you're doing anything, you let me know, let's get the police involved . . . It's not a threat it's a promise. You don't have any right to touch my stuff. Judge Cohen is corrupt and so are you[.]"

*Id.*)

60. After this latest refusal to act, the Receiver sought to proceed with the auction. *See* NYSCEF Doc. Nos. 2330, 2331, 2332, 2333. The state court ordered that the auction could proceed. NYSCEF Doc. No. 2335.

61. Mr. Simpson, as Plaintiff herein, now seeks to collaterally attack this very order of the state court, but he was previously granted reasonable opportunity to identify any personal items at the Montauk Property and refused to do so. The clear facts are that the ongoing delays caused by Mr. Simpson's tactics, including herein as Plaintiff, are leading to an erosion of equity and increased guarantor liability for Mr. Chassen.

62. The Receiver was put in place because Mr. Simpson grossly mismanaged JJ Arch as found by both Judge Mastando and Justice Cohen. The harm that Mr. Chassen faces if the Receiver is unable to act is financially devastating. Mr. Chassen has ongoing and growing guarantor liability. On the other hand, Mr. Simpson has shown every intent to weaponize that guarantor liability, while he seeks to discharge his debts in this personal bankruptcy while imposing maximum liability onto Mr. Chassen.

63. Moreover, any stay of the Receiver's ability to act will mean that either no one is in charge of the JJ Arch Controlled Entities or Messrs. Simpson or Chassen would need to be placed in charge. The record of the past 3 years, including but not limited to Judge Mastando's findings of gross mismanagement, shows that Mr. Simpson is incapable of being a fiduciary.

<h1 style="text-align:center"><u>OBJECTION</u></h1>

**I.** **The Automatic Stay Should Not Be Extended to Prevent the Receiver from Managing and Operating Rever Motors.**

      a.  <u>The Plaintiff has not met the standard for issuance of an injunction.</u>

64.    Courts in the Second Circuit have repeatedly held that the "preliminary injunction standard" applies to a request for a stay against non-debtors, issued under § 105(a) of the Code. *See Manchester CP v. Konstantinou*, No. 2:17-cv-9, 2017 U.S. Dist. LEXIS 189534 (Vt. Nov. 16, 2017); *In re SDNY 19 Mad Park, LLC*, No. 14-11055 (ALG), 2014 Bankr. LEXIS 3877 (Bankr. S.D.N.Y. Sept. 11, 2014); *In re Capitale Ventures I, LLC*, No. 14-11984 (ALG), 2014 Bankr. LEXIS 3099 (Bankr. S.D.N.Y. July 21, 2014).

65.    The standard for issuance of a § 105 injunction is as follows:

> The first requirement is that there be danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize. Second, there must be a reasonable likelihood of a successful reorganization. Third, the court must balance the relative harm as between the debtor and the creditor who would be restrained. Fourth, the court must consider the public interest; this requires a balancing of the public interest in successful bankruptcy reorganizations with competing societal interests.

*In re Capitale Ventures I, LLC*, 2014 Bankr. LEXIS 3099, at \*4 (*quoting In re United Health Care Org.*, 210 B.R. 228, 233 (Bankr. S.D.N.Y. 1997) (*quoting 2 Collier on Bankruptcy* ¶ 105.02[2] at 105-13 (15th [\*8] ed. 1997))). *See also In re SDNY 19 Mad Park, LLC*, 2014 Bankr. LEXIS 3877, at \*7.

66.    The Plaintiff has failed to show danger of imminent, irreparable harm. The Plaintiff has also failed to show (or even allege) the likelihood of a successful reorganization. The Plaintiff has failed to show (or even allege) that the balance of harm tilts in its favor. And, finally, the Plaintiff has not shown (or even alleged) that the public interest favors a stay protecting the non-debtor guarantor.

67. The Plaintiff cannot demonstrate the danger of imminent irreparable harm to his bankruptcy estate to support the requested injunction because the Receiver already ceased active operations of Rever Motors weeks ago after exercising his business judgment and concluding that Rever Motors had insufficient capital to continue operations as an auto restoration and sales business. The Receiver's prior shut down of the Rever Motor's business operations weeks ago moots the Plaintiff's request to enjoin the Receiver from shutting down the business and is plainly dispositive of that portion of the Motion.

68. In the Motion, the Plaintiff argues that that the Court should enjoin the Receiver from shutting down the business of Rever Motors because "cessation of the grandfathered nonconforming use, the value of the property…may then be used only for a single-family residence, will substantially decline to the point of being less than the amount of the mortgage debt which the Debtor has guaranteed." First, Plaintiff has not submitted any competent evidence to demonstrate the existence of a grand-father zoning exception or that such exception would be lost in the event the business was shut down. The Motion should be denied because the Plaintiff has not and cannot demonstrate any danger of imminent irreparable harm to his estate where the business of Rever Motors has already been shut down. To the extent the shutdown of Rever Motors could negatively impact the Debtor's estate (Movant vehemently disputes that it would or did) any potential harm has surely already been suffered because the business was already indisputably shut down by the Receiver.

69. The Plaintiff has not even alleged the likelihood of a successful reorganization. He offers no clues to what a reorganization would look like or how he would achieve it. Based upon the extensive history set forth hereinabove, that should not be a surprise. The Plaintiff has demonstrated a willingness to use the bankruptcy court not as a vehicle to reorganize, but instead

as a forum shopping sword in pending litigation. That is undoubtedly his strategy in filing his own personal Chapter 11 case. The Plaintiff will surely ask this Court to ignore the principles of the *Rooker Feldman* doctrine[12] and reconsider and vacate or modify orders issued by the state court in the Corporate Control Action. Indeed, Plaintiff's strategy was confirmed by his by filing a motion in the United States District Court for the Southern District of New York seeking leave to remove the Corporate Control Action yet again. The entire point of the commencement of Plaintiff's Chapter 11 case is to move the Corporate Control Action before a new judge, unfamiliar with his antics, where he might find a sympathetic ear. Several federal courts have rejected the Plaintiff's prior attempts at forum shopping the Corporate Control Action, and his related requests that federal courts reconsider the orders issued by the state court rendered in the same. This Court should follow the same path and refuse Plaintiff's overtures.

70. The Plaintiff has failed to show (or even allege) that the balance of harm tilts in his favor. There is no demonstrated harm to the Plaintiff, and even if there was, it would not tilt the scales in his favor.

71. As outlined above, the Plaintiff finds himself in a situation of his own making, having willfully refused to mitigate his losses and protect his asserted interests in property. His hands are unclean. Plaintiff subjected the Montauk Property to a foreclosure action by failing to pay rent. He subjected Rever Motors to investigations by the New York State Department of Motor Vehicles. He subjected Rever Motors to the loss of its license to operate as a vehicle repair shop. He failed to pay payroll taxes resulting in liens from the IRS. He failed to pay amounts owed to

---

[12] *See Rooker v. Fid. Tr. Co.*, 263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923)(lower federal courts are precluded from exercising jurisdiction over claims that seek to collaterally attack a state court judgment); *see also D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983)(the *Rooker-Feldman* doctrine bars lower federal courts from exercising jurisdiction over claims that are 'inextricably intertwined' with state court determinations.)

the New York State Worker's Compensation Board. He operated Revers Motors without adequate insurance. In short, Plaintiff effectively destroyed the business of Rever Motors and left it with insufficient capital to operate. His mismanagement led the state court to appoint the Receiver and charged the Receiver with taking control of the JJ Arch Controlled Entities. Since then, and despite the Plaintiff's disruptive and detrimental acts, the Receiver has been able to progress before the state court and make independent and rational business decisions for the JJ Arch Controlled Entities. On the other hand, the Plaintiff has a long demonstrated history of operating Rever Motors in his own personal interests and not in the interest of Rever Motors or its creditors. Now, the Plaintiff asks this Court to accept that his judgment is better than the judgment of the neutral court appointed Receiver and to prevent the Receiver from implementing a sale that the Receiver has determined to be in the best interests of Rever Motors and which he has worked toward for months.

72.     If the pending sale of the assets of Rever Motors is enjoined or delayed, the creditors of Rever Motors (including without limitation, the IRS, the New York Worker's Compensation Board, customers of Rever Motors, and Movant), would be severely prejudiced. The reason for that prejudice is clear. Their best means of recovering from Rever Motors is through a prompt sale of its assets. If Plaintiff is permitted by this Court to halt that sale effort simply to advance his personal leverage seeking agenda, the very person whose financial mismanagement created the financial crisis requiring the sale in the first place, it would be manifestly unjust. In addition, Movant, (and the Plaintiff) will suffer irreparable harm as a guarantor of the mortgage through the continued accrual of default interest in the approximate amount of $30,000 per month which continues to strip away any remaining equity each day this continues. And the Motion is put forth despite there being any reasonable prospect for Rever Motors to ever restart operations or otherwise use the Montauk Property as an auto restoration business.

73.    The Plaintiff also failed to demonstrate that public policy in any way favors granting him the relief requested in the Motion.   That is likely because no legitimate policy supports forcing a failed business that lacks sufficient capital to continue operations, particularly if there is a reasonable opportunity to liquidate its assets and preserve value for the benefit of its creditors. The only likely result of changing the status quo forcing Rever Motors to restart operations, even assuming it could legally do so, would be to create additional creditors who Rever Motors would be unable to pay in the ordinary course of its operations. The proposed sale by the Receiver is in the best interests of all parties-in-interest.   The balance of harms tips clearly toward allowing the sale to proceed for the benefit of the creditors of Rever Motors and public policy would favor allowing the state court appointed Receiver to implement the court approved sale.

b.    *Queenie* does not support extending the stay.

74.    Extension of the automatic stay proposed by Plaintiff in the Motion is inconsistent with the general rule that the stay does not apply to non-debtors. The facts of this case do not fit within the very narrow exception that was recognized by the Second Circuit in *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003) where a debtor is able to demonstrate the threat of immediate adverse economic consequences.

75.    This case is not analogous to *Queenie.*   In that case, a plaintiff sought to continue the prosecution of a cause of action against a non-debtor, where continued prosecution of that cause of action was simultaneously stayed against the debtor.   There, the Plaintiff argued that continued prosecution of the cause of action against the non-debtor would effectively liquidate the claim against the debtor.   Here, the state court has already determined that sufficient grounds existed for the appointment of the Receiver over Rever Motors (and the other JJ Arch Controlled Entities) and thus it granted to the Receiver sole managerial authority and authorized the Receiver

to sell Rever Motor's assets. The Receiver now seeks to sell the assets of Rever Motors on behalf of Rever Motors in an exercise of the authority granted to him in the Receiver Order and the Sale Order. Further, because the Receiver already ceased the active operations of Rever Motors, the alleged immediate adverse economic consequence identified by Plaintiff in the Motion cannot be prevented by issuing an injunction or extending the stay. No order of this Court could put the toothpaste back in the tube and require the Receiver to restart operations. According to Plaintiff's own argument, restarting operations would violate residential zoning restrictions because, if Plaintiff is right about the potential loss of the exception (and he submits no competent evidence that he is), according to him the Receiver's prior shut down of operations would have already resulted in the loss of alleged exception to the zoning restrictions.

76. Unlike *Queenie*, Plaintiff is not asking this Court to stay a cause of action against non-debtor Rever Motors on the basis that the prosecution of the action would result in immediate adverse economic consequences to Plaintiff. Instead, Plaintiff is asking the Court to extend the stay to prevent the Receiver, who was appointed in the context of Movant's pending claims against JJ Arch, from managing Rever Motors in a manner that the Receiver has determined to be in the best interests of Rever Motors. Movant is unaware of any case where a Court determined that it had the authority to extend the automatic stay to prevent a non-debtor fiduciary from managing a controlled entity in accordance with the terms of a valid state court order.

77. Plaintiff is not in agreement with the Receiver's business judgment and it is obvious that Plaintiff would prefer that this Court substitute Plaintiff's judgment for the judgment of the Receiver and effectively reconsider the state court's Receiver Order and the Sale Order. In what has become an all too familiar pattern, Plaintiff is using his personal bankruptcy case as a forum shopping exercise to try to collaterally attack the Receiver Order and the Sale Order. The *Rooker*

*Feldman* doctrine prohibits the Plaintiff from seeking reconsideration of those orders by this Court.

78. Plaintiff's request that this Court enjoin the Receiver from performing his court appointed duties is consistent with his unfailing belief that he knows best in all situations and that any court that does not rule in his favor must be corrupt, ignorant or just plain incompetent. This Court should reject Plaintiff's invitation to reconsider the state court's valid decisions by extending the automatic stay to prevent the sale of the assets of Rever Motors. This Court should not endorse another forum shopping expedition by Mr. Simpson.

      c. The Plaintiff has not demonstrated that the Court has jurisdiction to force a non-debtor to restart business operations.

79. To the extent Plaintiff is seeking any order that would direct the Receiver to restart operations of Rever Motors, that request must be denied because the Court lacks subject matter jurisdiction to impose such a directive upon a non-debtor. Not surprisingly, Plaintiff has not set forth any legal or factual basis to support the imposition of such a directive. Such a directive would not benefit the creditors of Rever Motors or the Plaintiff since the Receiver determined to cease operations because the non-debtor was insufficiently capitalized and could not pay its debts as they became due.

**II.    The Court Should Not Delay the Sale To Allow the Plaintiff To Access the Montauk Property Since He Willfully Refused Multiple Offers of Access Prior to Filing the <u>Motion.</u>**

80. The Court should not delay the Receiver's sale of Rever Motors's assets on the feigned excuse that Plaintiff does not know whether he might own some of the assets that the Receiver anticipates selling as part of the auction. The Plaintiff finds himself in this situation only as the result of the Plaintiff's unclean hands in having willfully refused the Receiver's multiple offers of access to the Montauk Property.

81.     Plaintiff's protestation that there was not a "satisfactory opportunity" to visit the Montauk Property to determine whether he owns any of the property located there is all too telling as to his motives in filing to Motion - delay, delay, delay. Noticeably absent from the Motion is any explanation why he was unable to visit the Montauk Property to inspect, what efforts he made to visit or inspect, or even any indication of what property Plaintiff believes he might own. It defies logic to suggest that Plaintiff cannot identify any property that he owns without first putting his eyes on such property. He was in control of the Montauk Property and all of the property stored thereon as recently as last year.

82.     One need not be a prognosticator to foresee that Plaintiff will agree to access to the Montauk Property only after delaying for as long as the Court will allow, then he will likely create an over inclusive list of items that he claims to own, but he will claim that he does not have access to records necessary to prove his ownership.  After that, he will ask for discovery and then he will ask for an evidentiary hearing on the issue of ownership, all for the sole purpose of delaying the sale and furthering his obstructionist agenda.

83.     The factual record is clear that Plaintiff has had more than ample opportunity to visit and inspect the items located at the Montauk Property in order to assess whether he owns any of those items.  In fact, the state court already expressly determined that Mr. Simpson's failure to visit and inspect should not be a basis for delaying the Receiver's proposed sale. Moreover, visiting the property was not Plaintiff's only means of identifying items he believes he owns. He could have reviewed the Receiver's written auction inventory, which identifies the assets that the Receiver anticipates selling as part of the auction. Instead, Plaintiff consciously and willfully chose not to do those things so that he could take the exact course of action he is seeking to take in the Motion, *i.e* to delay the sale to provide himself more time to try to convince this Court that it

should violate the *Rooker Feldman* doctrine and reconsider numerous orders issued by the state court, including the Receiver Order and the Sale Order, all toward the goal of regaining control of JJ Arch and the JJ Arch Controlled Entities.

84.     Importantly, the Receiver has confirmed that he has no intention of selling Plaintiff's property, to the extent he has any left on the Montauk Property, but the Receiver should not be prevented from selling the property of Revers Motors simply because Plaintiff has strategically failed to inform the Receiver which items he believes he owns. Should the Court deem it appropriate to allow Mr. Simpson one more opportunity to visit the premises after the hearing but prior to the scheduled auction, it is respectfully submitted that the Court should require Plaintiff to do so within three (3) business days after the hearing on March 24 and to submit a list of disputed items on or before March 30, 2026, so that the sale of the undisputed assets of Revers Motors's may proceed on April 6, 2026, as currently scheduled.

85.     It should not be lost on this Court that Mr. Simpson intends to use the manufactured delay of the sale to try to convince this Court to reconsider its the orders issued by other Honorable Judges of this Court in other cases pending before it that involve Mr. Simpson (*In re YJ Simco LLC*, Chapter 11 Case No.: 25-10437-LGB) as well as the orders of other courts, including those of the state court in the Corporate Control Action. That strategy is plainly consistent with Mr. Simpson's strategy in having commenced this case in the first place, *i.e.,* to frustrate the efforts of the Receiver at all costs and prevent him from doing the job that the state court has asked him to do while at the same time hoping he can convince this Court to vacate or modify the pending and otherwise enforceable orders of other courts of competent jurisdiction.

WHEREFORE, Movant respectfully requests that the Court enter an Order denying the Motion in its entirety and indicating that the stay shall not be extended and is otherwise inapplicable to the Receiver's management and operation of the JJ Arch Controlled Entities, including the sale of the JJ Arch Controlled Entities' property, together with such other relief as the Court deems appropriate.

Dated: New York, New York
March 17, 2026

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP

By: __/s/ Sean C. Southard_____
Sean C. Southard
Brendan M. Scott
200 W. 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
ssouthard@klestadt.com
bscott@klestadt.com

SCHWARTZ LAW PLLC
Allen Schwartz, Esq.
150 Broadway, Suite 701
New York, NY 10038
Telephone: (347) 460-5379
allen@allenschwartzlaw.com

*Co-Counsel to Jared Chassen*