BECKER, GLYNN, MUFFLY,
CHASSIN & HOSINSKI, LLP
299 Park Avenue
New York, New York 10171
(212) 888-3033
Alec P. Ostrow
aostrow@beckerglynn.com

*Proposed Attorneys for Plaintiff, Jeffrey Solomon
Simpson, as Debtor and Debtor in Possession, Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>JEFFREY SOLOMON SIMPSON,<br><br>         Debtor. | Chapter 11<br><br>Case No. 26-10359 (LGB) |
| JEFFREY SOLOMON SIMPSON, as Debtor and Debtor in Possession,<br><br>         Plaintiff,<br><br>  -  against  -<br><br>ERIC HUEBSCHER, as Receiver of Certain Assets of JJ Arch, and JARED CHASSEN,<br><br>         Defendants. | Adversary  No. 26-01013 (LGB)<br><br>**<u>AMENDED COMPLAINT</u>** |

Plaintiff Jeffrey Solomon Simpson (the "Debtor"), as Debtor and Debtor in Possession,

complaining of the defendants, respectfully sets forth and alleges:

### <u>Introduction</u>

1.     This adversary proceeding was originally commenced by the Debtor and Debtor

in Possession for an injunction to enforce and expand the automatic stay to prevent the defendant

Eric Huebscher, as Receiver of certain assets of JJ Arch (the "Receiver") from selling assets that the Debtor contends to be property of the estate and property that he may exempt from the estate until such claims can be resolved, and to shut down a business the effect of which will, by virtue of the loss of a grandfathered exception to the local zoning laws, result in a substantial diminution of the value of property, subject to a mortgage guaranteed by the Debtor, and risk the expansion of the Debtor's liabilities, thereby impeding the Debtor's reorganization efforts. As a result of the Court-authorized intervention of Jared Chassen, this adversary proceeding seeks additional relief to declare that Mr. Chassen was not a member of JJ Arch LLP ("JJ Arch") at the time he sought the appointment of a temporary receiver, and therefore had no standing to seek such appointment, which should result in the termination of such appointment. This proceeding also seeks an accounting from the receiver and a turnover of assets held by the receiver.

### Jurisdiction and Venue

2. This adversary proceeding is commenced in connection with the Debtor's chapter 11 bankruptcy case pending in this district, case no. 26-10359. The Debtor filed his voluntary chapter 11 petition with this Court on February 19, 2026.

3. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b).

4. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

5. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Debtor consents to the entry of final orders or a final judgment by the bankruptcy court.

4903-1336-3621 v.1

**Parties**

6.      Plaintiff is the Debtor and the debtor in possession in this bankruptcy case.  On the filing of the Debtor's voluntary chapter 11 petition, the Debtor became a debtor in possession, pursuant to sections 1101(1) and 1107(a) of title 11 of the United States Code (the "Bankruptcy Code").  No separate trustee or examiner has been appointed.

7.      Defendant Eric Huebscher, the Receiver, was appointed as temporary receiver by Order Appointing Temporary Receiver, dated March 11, 2025, of the Supreme Court of the State of New York, County of New York (the "State Court") over certain directly owned and controlled assets of JJ Arch, four in total, in an action entitled *Simspon  v. Chassen*, Index No. 158055/2023 (the "158055 Action").  The appointment of a receiver in the 158055 Action was sought by defendant Jared Chassen.  Prior to his appointment as the Receiver, Mr. Huebscher served as the subchapter V trustee of JJ Arch in JJ Arch's bankruptcy case in the United States Bankruptcy Court for the Southern District of New York, case no. 24-10381 (JPM).  In the JJ Arch bankruptcy case, Mr. Huebscher did not establish a friendly and professional working relationship with the Debtor, who served as management of JJ Arch.  At the time of Mr. Huebscher's appointment as Receiver, Mr. Huebscher was serving as

(a) an elected chapter 7 trustee in the case of Barbara J. Abadi, in the United States Bankruptcy Court for the Eastern District of New York, case no. 1-24-42873 (JMM), in which case Mr. Huebscher is represented by the firm of Klestadt Winters Jureller Southard & Stevens, LLC, a firm that was co-counsel to Mr. Chassen in the JJ Arch bankruptcy case and is co-counsel to Mr. Chassen in this bankruptcy case and adversary proceeding; and

4903-1336-3621 v.1

(b) a post-confirmation litigation trustee in the chapter 11 case of Michael

Maidan, dba Grand Avenue Building II, LLC, dba East End Ventures LLC, dba 1907

Harrison Realty LLC, dba 550 Metropolitan LLC, dba 62 Grand Ave LLC, in the United

States Bankruptcy Court for the Eastern District of New York, case no. 8-19-77027-las,

in which case, the dba 550 Metropolitan LLC concerns one of the "JJ Arch Controlled

Properties" enumerated in the Order Appointing Temporary Receiver, namely, 550

Metropolitan Avenue, Brooklyn, New York 11211.

Upon information and belief, neither of Mr. Huebscher's roles described in (a) and (b) above was

disclosed to the presiding justice in the 158055 Action at the time of Mr. Huebscher's

appointment as the Receiver.

8.      Defendant Jared Chassen sought and was granted leave to intervene in this

adversary proceeding by order of this Court, dated March 24, 2026 [ECF Doc. 21].

### Factual Background

9.      The circumstances leading to the filing of the Debtor's petition derive from the

Debtor's interest in and operation of a group of real estate holding and operating companies

known as the "Arch Companies."  At their peak, the Arch Companies managed or controlled

real estate valued in excess of $1 billion across the United States.  The Arch Companies are

composed of numerous affiliated operating and investment entities, including an operating

company and a holding company for each real property.  In the aggregate, there were

approximately 125,000 third-party investors in the Arch Companies' properties in addition to

myself, my family, and other related parties.  The structure of the Arch Companies necessarily

required the Debtor to be a fiduciary for the benefit of all parties and there were provisions that

4

limited AREH's Managing Member role to prevent its benefiting financially for itself or its members without the consent of other parties, except as expressly set forth in the applicable documents.

10. The following is a simplified version of a complex corporate structure for the Arch Companies. In general, the Arch Companies' properties were managed by Arch Real Estate Holdings LLC ("AREH"), as a non-member manager of the separate limited liability companies owning or operating the properties. Prior to the litigation described below, the Debtor was the sole person, corporately through JJ Arch, directing the operations of AREH and hence had direct supervision over all the Arch Companies' properties and business affairs.

11. AREH, in turn, had two members, JJ Arch, the managing member had an 80% interest, and 608941 NJ Inc. ("Oak"), an investor member, had a 20% interest with a sunset provision after a 5-year exclusivity period. Oak is subsidiary of 35 Oak Holdings Ltd. ("35 Oak"). In the Arch Companies' business model, Oak's purpose was not managerial. It had only the ability to veto certain major decisions and/or transactions. Its purpose was to provide loan guarantees and seed equity alongside funding provided by the Debtor, Jared Chassen, a minor owner of JJ Arch, the families of the Debtor and Mr. Chassen, and a few key employees. Oak's main benefit was to receive 50% of all property-related profits in return for the contractual obligations it undertook.

12. Oak is a New Jersey corporation with a principal place of business in Toronto, Canada. Its principals are Kevin Wiener, William Wiener, and Michael Weiner. In the corporate structure for each of the Arch Companies' properties, the holding company was owned by JJ Arch or a company controlled by JJ Arch and Oak or an affiliate of Oak or the Weiner family, and the property owner was owned by the holding company and several independent

4903-1336-3621 v.1

investors. The economics of the Arch Companies, including the distributions of profits, were controlled through a separate company, Arch Property Holdings I ("ARPH I"), which is a party to various operating agreements and of which Oak served as the Class A member, JJ Arch as the Class B member, which is the managing member, and two former key employees, Michelle Miller and Tristan Last, were Class C members. The Debtor also permitted a few other key employees to invest from time to time. ARPH I operated in conjunction with JJ Arch to control property-based distributions.

13. From the outset and at all relevant times, the Debtor was majority owner of JJ Arch. The minority owner was Mr. Chassen. As discussed below, Mr. Chassen's interest in JJ Arch was initially modified by amendment in 2021 and then divested in 2023, pursuant to the terms of the JJ Arch operating agreement, which the Debtor has referred to as both a resignation and a deemed resignation, based on his non-compliance with his financial obligations and his collusive relationship with Oak, which was not permitted by his agreement with JJ Arch, and manifested by his Common Interest, Joint Prosecution and Joint Defense Agreement with 35 Oak, dated August 6, 2023, but made effective *nunc pro tunc* as of August 3, 2023, an agreement the Debtor did not see until it was produced to me in litigation about two years after it was entered into. This agreement, combined with a purported "settlement" email, dated July 19, 2023, sent by Oak's counsel, illuminates a scheme by Oak, in which Mr. Chassen participated, to strip the Debtor from his interests in the Arch Companies and JJ Arch. As discussed below, the Debtor also fired Mr. Chassen. (The interplay among resignation, deemed resignation, and firing has been the subject of considerable litigation filings, and need not be elaborated in this complaint.) Although the Debtor maintained his managerial control of JJ Arch, his ownership interest in JJ Arch was transferred to YJ Simco in 2022. The Debtor's ownership interests in

6

certain JJ Arch directly owned entities, not related to AREH, in which Mr. Chassen and the Debtor had an ownership interests, were also transferred to YJ Simco in 2023. These transfers were made pursuant to an agreement, dated August 1, 2023, and defined below as the "August 1 Agreement." The August 1 Agreement was made for the benefit of Mr. Chassen to eliminate Mr. Chassen's liability to the Debtor resulting from an imbalance in member loans taken from JJ Arch at the time Oak's interest in AREH was reaching its contractual sunset.

14. As the relationship with Oak was reaching its contractual sunset, the Debtor began the process of establishing himself as the sole future guarantor for AREH's properties. The Debtor's lawyers, accountants, and internal team helped him start to build up a family office structure using YJ Simco, along with a proposed family trust for the benefit of his wife and children. Given the need to have a bankable balance sheet for institutional lenders' financial requirements, the Debtor started purchasing properties directly with his wife and through JJ Arch. In one case in particular, which involved property in Palm Beach, Florida, the Debtor was able to satisfy a lender to use his personal guaranty as the sole guaranty of property to be acquired by AREH, but Oak's guaranty was included, nevertheless.

15. Starting in late 2022, owing to financial turmoil in the global real estate investment and lending markets due to high inflation and exceptional interest rate growth, and coincidentally as Oak's period of exclusivity was ending, substantial disagreement developed among Oak and JJ Arch regarding the Debtor as the only controlling person in the Arch Companies. In particular, the Debtor took part in a presentation to Oak that demonstrated significant future capital needs which Oak would be required to fund pursuant to its agreements and loan guarantee obligations. Despite its contractual obligations, Oak refused to provide the required funding. The Debtor spent six months working with outside counsel, Y. David Scharf

of Morrison Cohen, his internal team, and separate lender and investor groups trying to find solutions for Oak's unwillingness to fund. By mid-2023, the loans were imbalanced due to the increase in interests rates, and the lack of funding of equity caused a lack of lender fundings. Oak nevertheless demanded that the projects continue, and this resulted in $25 million of unpaid obligations across the AREH portfolio within 90 days. The Debtor also worked with an outside corporate attorney, Len Breslow of Breslow & Walker, who suggested that the only options for AREH were to source a new partner, dissolve, or to file for bankruptcy. The Debtor hired a broker to explore the first two options. Oak was aware of this, and it worked to sabotage the broker's efforts.

16. As a result, the Debtor proposed exploring a possible bankruptcy filing of AREH and related entities. Since the Debtor could not come to terms with Oak, Oak gave the Debtor two options: (1) Give the keys to the properties back to their respective lenders to allow Oak to seek guarantee relief; and (2) Oak would borrow funds, but the Debtor had to change the distribution waterfall on the properties to Oak's benefit (and to the detriment of the independent investors), a change that was prohibited by the relevant documents. In mid-July 2023, Oak decided that it would push the Debtor out of the Arch Companies and use Mr. Chassen to implement this plan, a maneuver that would result in substantial defaults under the lender and investor agreements. A July 19, 2023 "settlement" email sent by counsel for Oak to Mr., Breslow illustrates both Oak's motive and the blueprint for what ultimately followed. This "settlement" email caused an immediate conflict between Mr. Chassen and the Debtor. Mr. Chassen refused the Debtor's request to say "no" to Oak, and the Debtor fired him, after trying to work with him for almost two weeks, because the Debtor felt he had no choice. Oak's principals resisted the firing of Mr. Chassen and the potential bankruptcy filings for AREH and related

8

entities because they believed that bankruptcy filings would trigger numerous corporate and personal guarantees they had issued in connection with the Arch Companies' properties. Subsequently, 35 Oak and Mr. Chassen entered into the Common Interest, Joint Prosecution and Joint Defense Agreement, described above, to allow their attorneys to share confidential attorney-client matter because they determined that their economic interests were aligned and contrary to the Debtor's. Litigation over the control of the Arch Companies eventually ensued. Some, but not all, of this litigation and the activities in the litigation will be described below.

17. After the Debtor fired Mr. Chassen on August 5, 2023, in furtherance of his plan with Oak, he took several unauthorized actions against the Debtor in connection with the Arch Companies. In particular, Mr. Chassen misled a banking institution into removing the Debtor's access to the bank accounts of AREH, JJ Arch, YJ Simco, and affiliated companies, and amazingly, the accounts belonging to the Debtor and his family, at First Republic Bank, Mr. Chassen misled an information technology consultant into removing my access to company email and electronic records, and Mr. Chassen arranged to deactivate the Debtor's physical access to the Arch Companies' office.

18. Oak initiated litigation against the Debtor in the District Court for the Southern District of New York on August 10, 2023, alleging, among other things, breach of fiduciary duties, tortious interference with prospective business advantage, and defamation, This case was later withdrawn by Oak, approximately six months after it was commenced. Oak thereafter intervened in the 158055 Action.

19. On August 14, 2023, the Debtor commenced the 158055 Action individually and derivatively as managing member of JJ Arch, and in turn, derivatively as managing member of AREH against Mr. Chassen and First Republic Bank, which sought to restore his access to the

4903-1336-3621 v.1

Arch Companies' accounts and re-establish my control over AREH. Oak was not named in this action, although it later intervened. The Debtor came to learn that Oak had funded Mr. Chassen's legal fees in this action, in excess of $250,000 to start, even hiring the firm of Fried, Frank, Harris, Shriver & Jacobson LLP to represent Mr. Chassen, a firm that had worked for AREH while the Debtor was in control of AREH.

20. After the Debtor achieved some initial success in the 158055 Action in restoring his access and managerial rights, Oak intervened and with Mr. Chassen's support sought the temporary appointment of a receiver and a preliminary injunction to be installed as the managing member of AREH, while continuing to resist its obligations to fund the Arch Companies and continuing to make threats against the Debtor when the Debtor pressed the possibility of an AREH bankruptcy petition. Even though Mr. Chassen admitted to his "self-help" initiatives, the state court allowed him back in the business and eventually enjoined the Debtor from removing him. Oak ultimately persuaded Justice Joel M. Cohen of the State Court to issue a preliminary injunction to install Oak as the managing member of AREH and enjoined the Debtor from engaging in managerial activities for AREH. The results of Oak's management of AREH have been catastrophic. Bills have gone unpaid and Arch Companies' properties have gone into foreclosure or been disposed of through deeds in lieu of foreclosure, engineered by Oak in exchange for guarantee relief, transactions prohibited by the relevant agreements in the absence of consent from investors as well as from the Debtor in his capacity as the representative of the managing member of the relevant investment entities in the corporate structure. Moreover, notwithstanding the corporate structure described above, Oak, acting through Mr. Chassen, purported to exercise rights belonging to JJ Arch and its affiliates, including taking actions that require the consent of JJ Arch or its affiliates, which could only have been supplied by the

10

Debtor.  Independent investors have lost significant money and have threatened actions, including against me.  JJ Arch and its own third-party investors also lost significant money.

21.     In an effort to preserve the value of JJ Arch and the possibility of an overall restructuring of the Arch Companies, as the managing member of JJ Arch, the Debtor authorized and directed the filing of JJ Arch's voluntary chapter 11 filing on March 7, 2024, initially as a subchapter V case, but later amended to remove the subchapter V designation.  The Debtor also authorized the removal of the 158055 Action in the JJ Arch bankruptcy case.  Unfortunately, these efforts were not successful.  On June 10, 2024, Judge Mastando issued proposed findings of facts and conclusions of law to the district court to recommend the remand of the 158055 Action to determine the corporate control disputes between Mr. Chassen and the Debtor, and also issued an order granting motions filed by AREH (as controlled by Oak) and Mr. Chassen confirming that the automatic stay did not apply to certain corporate governance disputes or alternatively, lifting the automatic stay regarding certain corporate governance disputes, conditioned upon the district court's ruling on remand motion.  The district court did not reach the merits of the remand motion, because on October 11, 2024, Judge Mastando issued a Memorandum Opinion and Order on Jared Chassen and ARCH Holdings LLC's Joint Motion to Dismiss the Chapter 11 Case for the Debtor's failure to Comply with its Obligations, which dismissed the JJ Arch chapter 11 case and, as a consequence, also dismissed all pending adversary proceedings in the case.  An appeal of the dismissal order in the JJ Arch case is pending in the district court.  On December 2, 2025, Judge Mastando denied JJ Arch's motion for an indicative ruling for relief from the dismissal order.

22.     In the 158055 Action back before Justice Cohen, after several prior unsuccessful attempt to seek the appointment of a receiver, on March 8, 2025, the State Court granted the

11

motion of Mr. Chassen to appoint a receiver, and by Order Appointing Temporary Receiver, dated March 11, 2025, appointed Eric Huebscher, who had served as the subchapter V trustee of JJ Arch while the subchapter V designation was in effect, as the Receiver over certain specific entities controlled by JJ Arch (the "JJ Arch Controlled Entities") and certain specific real properties and one business assets (the "JJ Arch Controlled Properties"). In this order, the Receiver was given authority to "manage, rent, lease, sell or develop the JJ Arch Controlled Properties, and take any other steps reasonably necessary to maximize the remaining equity belonging to the JJ Arch Controlled Entities." Despite having been instructed to respect the rights of both the Debtor and Mr. Chassen, the Receiver, in his management of the JJ Arch Controlled Entities and the JJ Arch Controlled Properties, has favored Mr. Chassen to the detriment of the Debtor.

**The Proposed Asset Sale**

23. The Receiver began the receivership by quickly selling properties under his control, include the real property known as 225 Head of Pond Road, Water Mill, New York 11976. In the 158055 Action, the Receiver sought and obtained an order, dated December 23, 2025, authorizing him to sell the assets of 1640 Motors LLC d/b/a Rever Motors via public auction (the "Auction Order").

24. The Auction Order further provided:

> **ORDERED**, that Simspon (accompanied by counsel) shall, within fourteen (14) days of entry of this Order, be provided access to the Business Premises to identify assets to which Simpson claims ownership and can demonstrate, to the Receiver's satisfaction and subject to the Court's review, such ownership, and that such assets shall not be sold by the Receiver; and it is further

4903-1336-3621 v.1

**ORDERED**, that the Receiver is not authorized to sell any Assets (or parts thereof) the ownership of which remains in dispute, subject to the Court resolution of such disputes; . . .

25. Despite the provision in the Auction Order for the Debtor to be provided access to the Business Premises to identify his assets, there was not a satisfactory opportunity for the Debtor (accompanied by counsel) to visit the Business Premises to identify his property.

26. In the 158055 Action, the Receiver sought and obtained a supplemental order, dated January 23, 2026, in connection with the sale of Rever Motor assets (the "Supplemental Order").

27. The Supplemental Order contained the following finding:

**WHEREAS**, the Court finds that the Receiver has provided Simpson access to the Business Premises as required by the Auction Order and that Simpson's failure to visit the Premises to identify assets to which he claims ownership within the period provided in the Auction Order shall not be a basis for delaying the Receiver's sale of the Rever Motors' assets located there; . . .

28. The Supplemental Order further provided:

**ORDERED THAT:**

1. The Application is granted as set forth herein.

2. The Receiver is authorized to proceed with the sale of the Rever Motors' assets located on the Business Premises.

3. The Auction Order remains in full force and effect.

29. Notably, neither the Auction Order nor the Supplemental Order purported to terminate or otherwise determine the Debtor's ownership interest in the property to be sold.

## The Shutdown of the Business

30.     The real property on which Rever Motors has carried on business is currently zoned for residential use.  Because the Rever Motors business pre-dated the current zoning law, its nonconforming use is grandfathered.

31.     The real property on which Rever Motors has carried on in business is subject to a mortgage in favor of Watermill Capital Holdings.  The Debtor has guaranteed the mortgage debt.

32.     In the event of a cessation of the grandfathered nonconforming use, the value of the property, which may then be used only for a single-family residence, will substantially decline to the point of being less than the amount of the mortgage debt, which the Debtor has guaranteed.

33.     The Receiver is not required to shut down the business, and in doing so, threatens to increase the Debtor's liabilities substantially and impair his reorganization efforts.

## First Claim for Relief – Enforcement of the Automatic Stay – 11 U.S.C. § 362(a)

34.     The Debtor repeats and realleges the allegations in paragraphs 1 through 33 of this amended complaint as if set forth at length herein.

35.     The filing of the Debtor's bankruptcy petition created an estate, pursuant to section 541(a)(1) of the Bankruptcy Code, which consists in part of "all legal and equitable interests of the debtor in property as of the commencement of the case" and property is in the bankruptcy estate, pursuant to section 541(a) of the Bankruptcy Code, irrespective of "wherever [such property] is located and by whomever held."

36.     Pursuant to section 522(b)(1) of the Bankruptcy Code, an individual debtor, such as the Debtor, is permitted to exempt from the bankruptcy estate, certain property.  Such property

14

is set forth on the Debtor's Schedule C, which has not yet been filed. The Debtor is permitted to elect a set of exemptions under state and non-bankruptcy federal law or under section 522(d) of the Bankruptcy Code. Either set of exemptions permits the exemption of an automobile and other property of any nature, subject to a limitation in value.

37. The filing of the Debtor's bankruptcy petition imposed an automatic stay, pursuant to section 362(a) of the Bankruptcy Code applicable to "all entities" that among other things, prevents in subsection 362(a)(3) "any act to exercise control over property of the estate."

38. As recognized in the Auction Order and the Supplemental Order, the Debtor claims ownership in property that is scheduled to be sold. Despite the finding in the Supplemental Order, which the Debtor challenges, that the Receiver has provided the Debtor with access to the Business Premises and that the Debtor's failure to visit the Premises to identify assets in which he claims ownership within the period provided by Auction Order shall not be a basis for delaying the Receiver's sale, the filing of the Debtor's petition and the resulting creation of the bankruptcy estate and imposition of the automatic stay supersede the authority granted to the Receiver by the state court orders. The Receiver may not exercise control over property of the estate.

39. Since there has been no determination of what property the Receiver proposes to sell is property the estate, the Debtor is entitled to an injunction enforcing the automatic stay to prevent the sale until there is a determination that no property of the estate will be sold.

40. This Court entered an Order Granting in Part and Denying in Part Plaintiff's Motion for Injunctive Relief Enforcing and Expanding the Automatic Stay on March 25, 2026 [ECF Doc. 22]. The injunction provided by such Order should be maintained and extended pending the final determination of this adversary proceeding.

15

41.     The Debtor repeats and realleges the allegations in paragraphs 1 through 33 and 35 through 40 of this amended complaint as if set forth at length herein.

42.     Section 105(a) of the Bankruptcy Code authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  This provision has been construed to authorize injunctive relief against acts that have immediate adverse economic consequences for a debtor's estate, or when the estate is likely to suffer irreparable harm in the absence of such relief.

43.     The shutting down of the business and concomitant loss of value of the underlying real property due to the imposition of zoning restrictions results in the risk of immediate economic consequences that are irreversible.

44.     To the extent that the loss of value of the real property renders the mortgage debt undersecured, the Debtor's guaranty of such debt will result in increased liability, which is currently not calculable, and threatens to impede the Debtor's reorganization

**Third Claim for Relief – Declaration that Jared Chassen Had No Standing to**
**Seek a Receiver for JJ Arch**

45.     The Debtor repeats and realleges the allegations in paragraphs 1 through 33 and 35 through 40 of this amended complaint as if set forth at length herein.

46.     Mr. Chassen signed an agreement, dated as of August 1, 2023, with the Debtor, and YJ Simco LLC (the "August 1 Agreement").  The August 1 Agreement, in which Mr. Chassen and the Debtor are referred as the "Parties," provides in Section 1 in relevant part:

> On the date hereof (the "Closing Date"), the Parties (and their
> respective relatives and affiliates, including but not limited to

16

Deborah Chassen and Arielle Chassen (the "Chassen Affiliates")) shall transfer to YJ Simco, all of the membership interests in the Simpson Companies that are beneficially owned by Chassen or the Chassen Affiliates as of the date hereof other than 1640 Montauk. The Parties shall cause JJ Arch LL [sic], a New York limited liability company to transfer 100% of its membership interest in 1640 Montauk to YJ Simco.

Significantly, the "Simpson Companies" as defined in Recital B of the August 1 Agreement are "1640 Montauk," which is defined term in Recital A for 1640 Montauk LLC, a New York limited liability company, and "1640 Opco," which is a defined term in Recital A for 1640 Motors LLC, a New York limited liability company. 1640 Motors LLC does business as Rever Motors.

47. The August 1 Agreement further provides in Section 4:

As of the date hereof, the Parties collectively, directly and indirectly, own certain automobiles and other vehicles. As of the Closing, Chassen agrees to transfer titles in all vehicles under his (or a Chassen Affiliate's) name to Simpson. Simpson hereby also agrees that, as of the Closing, he will transfer title for the vehicles listed on Exhibit A to Chassen or Chassen's designee.

48. Exhibit A to the August 1 Agreement provides:

Automobiles

1983 Black Porsche 911 SC – Completed.
1993 Mercedes Benz 230 GE – Completed. Chassen to pay for seats directly and for paint, of which $3,500 has already been paid.
2003 Land Rover Discovery

49. Mr. Chassen has received a transfer of the automobiles listed on Exhibit A to the August 1 Agreement.

50. As a result, the August 1 Agreement is enforceable as to Section 1 and Mr. Chassen is estopped from denying its enforceability.

4903-1336-3621 v.1

51. The August 1 Agreement predates by more than one year Mr. Chassen's motion for an order appointing a temporary receiver pursuant to section 6401 of the New York Civil Practice Law and Rules ("CPLR") for certain assets and interests belonging to JJ Arch, including 1640 Motors LLC. Consequently, Mr. Chassen sought the appointment of a temporary receiver for a company in which he had previously transferred his interest to YJ Simco.

52. As a result, the Debtor is entitled to a declaration that Mr. Chassen had no standing to seek the appointment of the Receiver.

**Fourth Claim for Relief – Termination of the Receivership**

53. The Debtor repeats and realleges the allegations in paragraphs 1 through 33, 35 through 40, and 46 through 52 of this amended complaint as if set forth at length herein.

54. Because the Receiver's control over Rever Motors, pursuant to a state court order, was obtained under circumstances where the moving party had no standing to seek such relief, the Debtor is entitled to an order terminating the receivership in accordance with article 64 of the CPLR and other applicable law, and upon the termination of the receivership, the Receiver should be directed to pay all moneys in his possession, custody or control into court, in accordance with Rule 7067 of the Federal Rules of Bankruptcy Procedure, Rule 67(a) of the Federal Rules of Civil Procedure, for the benefit of the Debtor and all other persons as their interests may appear.

**Fifth Claim for Relief – Accounting by the Receiver**

55. The Debtor repeats and realleges the allegations in paragraphs 1 through 33, 35 through 40, 46 through 52, and 54 of this amended complaint as if set forth at length herein.

4903-1336-3621 v.1

56.     As a result, the Debtor is entitled to an order directing the Receiver to provide this Court with a complete and public accounting of actions taken, and moneys received and disbursed, pursuant to article 64 of the CPLR and other applicable law.

**Sixth Claim for Alternative Relief If the August 1 Agreement Is Determined Not To Be Enforceable – Restoration by Mr. Chassen of the *Status Quo Ante***

57.     The Debtor repeats and realleges the allegations in paragraphs 1 through 33, 35 through 40, and 46 through 52 of this amended complaint as if set forth at length herein.

58.     If, notwithstanding the foregoing, the Court determines that the August 1 Agreement is not enforceable, the Debtor is entitled to an order directing Mr. Chassen to restore the *status quo ante* and to account for and return all property that he received pursuant to or as a result of the August 1 Agreement, including without limitation, the automobiles listed on Exhibit A to the August 1 Agreement.

WHEREFORE, the Debtor respectfully prays for a judgment (a) enjoining the Receiver from selling assets claimed to belong to the Debtor's estate until such claims can be resolved; (b) enjoining the Receiver from shutting down a business that will risk the expansion of the Debtor's liabilities and impede his reorganization efforts; (c) declaring that Jared Chassen had no standing to seek the appointment of the Receiver; (d) terminating the receivership and directing the Receiver to pay all moneys in his possession, custody, or control into court for the benefit of the Debtor and all other persons as their interest may appear; (e) directing the Receiver to provide a complete and public accounting of actions taken, and moneys received and disbursed; (f) in the alternative, if the Court determines that the August 1 Agreement is not enforceable, directing Mr. Chassen to restore the *status quo ante* and to account for and return all property that he received

19

pursuant to or as a result of the August 1 Agreement, including, without limitation, the automobiles listed on Exhibit A to the August 1 Agreement; and (g) granting the Debtor such other and further relief as is just.

Dated: New York, New York
April 28, 2026

BECKER, GLYNN, MUFFLY,
CHASSIN & HOSINSKI, LLP

By: _/s/ Alec P. Ostrow___
Alec P. Ostrow
aostrow@beckerglynn.com
299 Park Avenue
New York, New York 10171
(212) 888-3033

*Proposed Attorneys for Jeffrey Solomon Simpson, as Debtor and Debtor in Possession, Plaintiff*

4903-1336-3621 v.1