BECKER, GLYNN, MUFFLY,
CHASSIN & HOSINSKI, LLP
299 Park Avenue
New York, New York 10171
(212) 888-3033
Alec P. Ostrow
aostrow@beckerglynn.com

*Attorneys for Plaintiff, Jeffrey Solomon Simpson,*
*as Debtor and Debtor in Possession, Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>JEFFREY SOLOMON SIMPSON,<br><br>        Debtor. | Chapter 11<br><br>Case No. 26-10359 (LGB) |
| JEFFREY SOLOMON SIMPSON, as Debtor and Debtor in Possession,<br><br>        Plaintiff,<br><br>    - against -<br><br>ERIC HUEBSCHER, as Receiver of Certain Assets of JJ Arch,<br><br>        Defendant. | Adversary  No. 26-01013 (LGB) |

**DECLARATION OF JEFFREY SOLOMON SIMPSON TO SERVE AS HIS**
**DIRECT TESTIMONY FOR EVIDENTIARY HEARING**
**<u>SCHEDULED FOR JUNE 10, 2026</u>**

Jeffrey Solomon Simpson hereby declares under penalty of perjury, pursuant to 28 U.S.C.

§ 1746(a), as follows:

**Introduction and Background**

1.      I am the debtor in the within bankruptcy case.  I make this declaration to serve as my direct testimony for the evidentiary hearing scheduled for June 10, 2026.

2.      My educational background is as follows:  In 2002 I received a B.S. from the University of Delaware in civil engineering.  At the University of Delaware, I started in mechanical engineering with an idea to design automobiles, then switched majors by Sophomore year to pursue my career in real estate.  In 2004 I received a M.S. from New York University in real estate development and construction management.  In 2007 I received an advanced certificate in real estate finance.

3.      My professional background up to the founding of the Arch Companies, which will be described below, is as follows:  During the time I was in undergraduate and graduate school, I held various positions in engineering and working for large scale construction management firms.  After finishing the advanced certificate in real estate finance, I worked for eleven years at Greystone Development ("Greystone Development"), a property development company within a host of companies under the "Greystone" umbrella that performed functions related to real estate investment, capital raising, financing, development, construction, management, leasing, and sales.  For the last five of those years, I was the Chief Executive Officer of Greystone Development.  By the time I left Greystone Development, I was supervising approximately thirty employees at Greystone Development, with a total payroll of approximately $5 million. The total project volume was over $2 billion, and involved properties located in New York, Miami, and California. While I was there, I was also responsible for raising several large capital initiatives for real estate investing in multi-family housing in the

southeastern United States with an institutional partner, individual loan origination on complex assignments, and capital raising for structured finance.

4. As will be discussed below, because my access to my own documents was denied to me during the corporate control controversies that are at the heart of my financial difficulties, and not all of these documents have been returned to me, I do not have all the information necessary to present a complete and accurate description of the events set forth herein. The discussion that follows is presented to the best of my knowledge and ability under the circumstances.

5. The circumstances leading to the filing of the petition derive from my interest in and operation of a group of real estate holding and operating companies known as the "Arch Companies." At their peak, the Arch Companies managed or controlled real estate valued in excess of $1 billion across the United States. The Arch Companies are composed of numerous affiliated operating and investment entities, including an operating company and a holding company for each real property. In the aggregate, there were approximately 125 third-party investors in the Arch Companies' properties in addition to myself, my family, and other related parties. The structure of the Arch Companies necessarily required me to be a fiduciary for the benefit of all parties and there were provisions that limited AREH's Managing Member role to prevent its benefiting financially for itself or its members without the consent of other parties, except as expressly set forth in the applicable documents.

6. The following is a simplified version of a complex corporate structure for the Arch Companies. In general, the Arch Companies' properties were managed by Arch Real Estate Holdings LLC ("AREH"), as a non-member manager of the separate limited liability companies owning or operating the properties. Prior to the litigation described below, I was the

sole person, corporately through JJ Arch, directing the operations of AREH and hence had direct supervision over all the Arch Companies' properties and business affairs.

7. AREH, in turn, had two members, JJ Arch, the managing member had an 80% interest, and 608941 NJ Inc., an investor member, had a 20% interest with a sunset provision after a 5-year exclusivity period. I refer to 608941 NJ Inc. as "Oak," which is subsidiary of 35 Oak Holdings Ltd. ("35 Oak"). In the Arch Companies' business model, Oak's purpose was not managerial. It had only the ability to veto certain major decisions and/or transactions. Its purpose was to provide loan guarantees and seed equity alongside funding provided by me, Jared Chassen (was also from Greystone), a minor owner of JJ Arch, our families, and a few key employees. Oak's main benefit was to receive 50% of all property-related profits in return for the contractual obligations it undertook.

8. Oak is a New Jersey corporation with a principal place of business in Toronto, Canada. Its principals are Kevin Wiener, William Wiener, and Michael Weiner. In the corporate structure for each of the Arch Companies' properties, the holding company was owned by JJ Arch or a company controlled by JJ Arch and Oak or an affiliate of Oak or the Weiner family, and the property owner was owned by the holding company and several independent investors. The economics of the Arch Companies, including the distributions of profits, were controlled through a separate company, Arch Property Holdings I ("ARPH I"), which is a party to various operating agreements and of which Oak served as the Class A member, JJ Arch as the Class B member, which is the managing member, and two former key employees, Michelle Miller and Tristan Last (also joined me from Greystone), were Class C members. I also permitted a few other key employees to invest from time to time. ARPH I operated in conjunction with JJ Arch to control property-based distributions.

4920-1345-1187 v.1

9.      From the outset and at all relevant times, I was majority owner of JJ Arch. The minority owner was Mr. Chassen. Given the vast difference in experience and business acumen, I provided to him a 4 year, stepped structure, to hopefully be an equal partner to me. However, as discussed below, Mr. Chassen's interest in JJ Arch was initially modified by amendment in 2021,[1] and then divested in 2023, pursuant to the terms of the JJ Arch operating agreement, which I have referred to as both a resignation and a deemed resignation,[2] based on his non-compliance with his financial obligations and his relationship with Oak, which was not permitted by his agreement with JJ Arch, and manifested by his Common Interest, Joint Prosecution and Joint Defense Agreement with 35 Oak, dated August 6, 2023, but made effective *nunc pro tunc* as of August 3, 2023, an agreement I did not see until it was produced to me in litigation about two years after it was entered into. (I did know about it, but they refused to disclose at all costs). As discussed below, I also fired him, although he retaliated and continues to do so empowered by his improper contractual relationship with Oak. (The interplay among resignation, deemed resignation, and firing has been the subject of considerable litigation filings, and need not be elaborated in this declaration.) Although I maintained my managerial control of JJ Arch, my ownership interest in JJ Arch was transferred to YJ Simco in 2022. My ownership interests in certain JJ Arch directly owned entities, not related to AREH, in which Mr. Chassen and I had an ownership interests, were also transferred to YJ Simco in 2023.

10.     As the relationship with Oak was reaching its contractual sunset, I began the process of establishing myself as the sole future guarantor for AREH's properties. Absent

---

[1] Chassen caused a number of concerns that lead to a conversation where I shared my concerns of his abilities to be in a decision making role at this time. He agreed and we modified the agreement but I felt I needed to compensate him in consideration of these changes and he was grateful.

[2] Chassen told the SDNY BK Court in the JJ Arch LLC case, docket 43, that he clearly understood what resignation meant in the JJ Arch Agreement. At this point, we did not have the joint defense agreement to certify his collusion with Oak. Albeit, Mr. Schwartz told NYS Court that his client was not employed or compensated by Oak prior.

4920-1345-1187 v.1

another financial partner relationship, this was the only path forward. My lawyers, accountants, and internal team helped me start to build up a family office structure using YJ Simco, along with a proposed family trust for the benefit of my wife and children. Given the need to have a bankable balance sheet for institutional lenders' financial requirements, I started purchasing properties directly with my wife and through JJ Arch. Because I was, through the corporate structure, a minor interest holder in the AREH properties, for purposes of being a guarantor on future investments, the potential lenders were interested in seeing that I had a majority interests in other assets.

11. Starting in late 2022, owing to financial turmoil in the global real estate investment and lending markets due to high inflation and interest rate growth, and coincidentally as Oak's period of exclusivity was ending, substantial disagreement developed among the major players in the Arch Companies. In particular, I took part in a presentation to Oak that demonstrated significant future capital needs which Oak (if not other party would fund, and they generally chose not to, given economic conditions) would be required to fund pursuant to its agreements and loan guarantee obligations (under section 7.6.4 of the AREH agreement). Despite its contractual obligations, Oak refused to provide the required funding. I spent six months working with outside counsel, Y. David Scharf of Morrison Cohen, my internal team, and separate lender and investor groups trying to find solutions for Oak's unwillingness to fund. Since Oak subtly told Mr. Chassen that they were out of cash, I even offered to the lenders to put up my own personal guarantees to find workouts to save the investments. Many lenders agreed, and this would have lowered the capital needs by Oak. Without guarantee relief in full and no funding required at all, they would not listen to any proposal provided by us. By mid-2023, the lack of funding of equity caused a lack of lender fundings as well. Oak nevertheless demanded

6

that the projects continue, and this resulted in $25 million of unpaid obligations across the AREH portfolio within 90 days. I also worked with an outside corporate attorney, Len Breslow of Breslow & Walker, who suggested that the only options for AREH were to source a new partner, dissolve, or to file for bankruptcy. I, on behalf of JJ Arch and as Managing Member of AREH, hired a broker to explore the first two options. Oak was aware of this, and I believe that Oak worked to sabotage the broker's efforts by maliciously and intentionally circumventing the capital raising process.

12.     Since nothing else was acceptable to Oak, I explored a possible bankruptcy filing of AREH and related entities, although I did not hire any counsel or do anything to execute on such.[3] Since I could not come to terms with Oak, Oak gave me two options: (1) Give the keys to the properties back to their respective lenders to allow Oak to seek guarantee relief; and (2) Oak would borrow funds, but I had to change the distribution waterfall on the properties to Oak's benefit (and to the detriment of the independent investors), a change that was prohibited by the relevant documents. In mid-July 2023 (via an email sent on July 19, 2023, as a supposed settlement proposal to my counsel), Oak decided that it would push me out of the Arch Companies and use Mr. Chassen to implement this plan, a maneuver that would result in substantial defaults under the lender and investor agreements. This caused an immediate conflict between Mr. Chassen and me. Mr. Chassen refused my request to say "no" to Oak, and I fired him, because I felt I had no choice. Oak's principals resisted the bankruptcy filings for AREH and related entities because they believed that bankruptcy filings would trigger numerous corporate and personal guarantees they had issued in connection with the Arch Companies'

---

[3] There were only two people aware of this – Michelle Miller and Jared Chassen. Tristan Last was on a short term leave due to a family illness in Utah. Both Ms. Miller and Mr. Chassen provided this information to Oak, as they later told me. They also held secret meetings with Infinity Collective, the partner in two AREH projects, 2501 and 1700 Alton, where Mr. Chassen's cousin, David Berg, was a partner. These meetings were held in early July 2023, and Ms. Miller told me that she was directed to tell me about them.

4920-1345-1187 v.1

properties. Subsequently, 35 Oak and Mr. Chassen entered into the Common Interest, Joint Prosecution and Joint Defense Agreement, described above, to allow their attorneys to share confidential attorney-client matter because they determined that their economic interests were aligned and contrary to mine. Litigation over the control of the Arch Companies eventually ensued. Some, but not all, of this litigation and the activities in the litigation will be described below. None of this should have had impact on the directly owned and affiliated JJ Arch properties as they were not facing trouble or concern at this time.

13. After I fired Mr. Chassen on August 5, 2023, in furtherance of his plan with Oak, he took several unauthorized actions against me in connection with the Arch Companies. In particular, he misled a banking institution (First Republic Bank, now JP Morgan Chase) into removing my access to the bank accounts of AREH, JJ Arch, YJ Simco, and affiliated companies, and amazingly, the accounts belonging to me and my family, at First Republic Bank, he misled an information technology consultant (brother in law of Jason Paul of AREH, who confirmed the actions) into removing my access to company email and electronic records, and he arranged to deactivate my physical access to the Arch Companies' office (also through Jason Paul). Mr. Chassen purported to be a managing member of JJ Arch by his "self-help" and illegal actions. He utilized other key staff members to execute his plan, including Jason Paul and Michelle Miller.

14. Oak initiated litigation against me in the District Court for the Southern District of New York on August 10, 2023, alleging, among other things, breach of fiduciary duties, tortious interference with prospective business advantage, and defamation, This case was later withdrawn by Oak, approximately six months after it was commenced.

4920-1345-1187 v.1

15. On August 14, 2023, I commenced an action individually and derivatively as managing member of JJ Arch, and in turn, derivatively as managing member of AREH against Mr. Chassen and First Republic Bank in the Supreme Court of the State of New York County of New York, Index No. 158055/2023 (the "158055 Action"), which sought to restore my access to the Arch Companies' accounts and re-establish my control over AREH. Oak was not named in this action, although it later intervened. I came to learn that Oak had funded Mr. Chassen's legal fees in this action, in excess of $250,000 to start.

16. After I achieved some initial success in the 158055 Action in restoring my access and managerial rights, Oak intervened and sought the temporary appointment of a receiver and a preliminary injunction to be installed as the managing member of AREH, while continuing to resist its obligations to fund the Arch Companies and continuing to make threats against me when I pressed the possibility of an AREH bankruptcy petition. Even though Mr. Chassen admitted to his "self-help" initiatives, the state court allowed him back in the business and enjoined me from removing him. Oak ultimately persuaded Justice Joel M. Cohen of the state court to issue a preliminary injunction to install Oak as the managing member of AREH and enjoined me from engaging in managerial activities for AREH. The results of Oak's management of AREH have been catastrophic. Bills have gone unpaid and Arch Companies' properties have gone into foreclosure or been disposed of through deeds in lieu of foreclosure, engineered by Oak in exchange for guarantee relief, transactions prohibited by the relevant agreements in the absence of consent from investors as well as from me in my capacity as the representative of the managing member of the relevant entities in the corporate structure. Moreover, notwithstanding the corporate structure described above, Oak, acting through Mr. Chassen, purported to exercise rights belonging to JJ Arch and its affiliates, including taking

9

actions that require the consent of JJ Arch or its affiliates, which could only have been supplied by me. Independent investors have lost significant money and have threatened actions, including against me. JJ Arch and its own third-party investors also lost significant money.

17. In an effort to preserve the value of JJ Arch and the possibility of an overall restructuring of the Arch Companies, as the managing member of JJ Arch, I authorized and directed the filing of JJ Arch's voluntary chapter 11 filing on March 7, 2024, initially as a subchapter V case, but later amended to remove the subchapter V designation. I also authorized the removal of the 158055 Action in the JJ Arch bankruptcy case. Unfortunately, these efforts were not successful for a host of reasons, including the desire of Oak to prevent my having access to funds and insurance money to compensate counsel to advocate on my behalf. On June 10, 2024, Judge Mastando issued proposed findings of facts and conclusions of law to the district court to recommend the remand of the 158055 Action to determine the corporate control disputes between Mr. Chassen and me, and also issued an order granting motions filed by AREH (as controlled by Oak) and Mr. Chassen confirming that the automatic stay did not apply to certain corporate governance disputes or alternatively, lifting the automatic stay regarding certain corporate governance disputes, conditioned upon the district court's ruling on remand motion. The district court did not reach the merits of the remand motion, because on October 11, 2024, Judge Mastando issued a Memorandum Opinion and Order on Jared Chassen and ARCH Holdings LLC's Joint Motion to Dismiss the Chapter 11 Case for the Debtor's failure to Comply with its Obligations, which dismissed the JJ Arch chapter 11 case and, as a consequence, also dismissed all pending adversary proceedings in the case. An appeal of the dismissal order in the JJ Arch case had been pending for some time in the district court, but was decided last week, and

10

the dismissal was affirmed. On December 2, 2025, Judge Mastando denied JJ Arch's motion for an indicative ruling for relief from the dismissal order.

18. Also in 2024, the liability insurance policy issued by Great American Insurance Company ("GAIC") to AREH with a $3 million aggregate limit and as to which I am an insured person, because of my role in AREH and its operating entities, became the subject of litigation in state court. GAIC had funded the defense of claims against me, which included attorneys that I had hired to represent myself, JJ Arch, AREH (when it was under my control), and YJ Simco. After AREH sued GAIC to prevent the payment of fees to JJ Arch's counsel and Mr. Chassen made claims for coverage under the GAIC policy, on June 25, 2024, GAIC instituted an interpleader action against AREH, Mr. Chassen, the JJ Arch lawyers, and me in the Supreme Court of the State of New York, County of New York, Index No. 653208/2024 (the "Interpleader Action"). That action had been initially assigned to Justice Masley but was transferred to Justice Cohen under questionable circumstances. According to the complaint in the Interpleader Action, after the advance of costs on my behalf, the remaining aggregate coverage limit in the policy was in excess of $2.1 million. I removed the Interpleader Action to this Court. This Court has issued proposed findings of fact and conclusions of law to grant a motion to remand the Interpleader Action, but subject to the automatic stay.

19. In the 158055 Action back before Justice Cohen, on March 8, 2025, the state court granted the motion of Mr. Chassen to appoint a receiver (even though he explicitly referred to having received compensation from Oak, thereby resulting in the contractual loss of his membership interest and eliminating any grounds for him to seek such relief), and by Order Appointing Temporary Receiver, dated March 11, 2025, appointed Eric Huebscher, who had served as the subchapter V trustee of JJ Arch while the subchapter V designation was in effect,

as the Receiver over certain specific entities controlled by JJ Arch (the "JJ Arch Controlled Entities") and certain specific real properties and one business assets (the "JJ Arch Controlled Properties"). In this order, the Receiver was given authority to "manage, rent, lease, sell or develop the JJ Arch Controlled Properties, and take any other steps reasonably necessary to maximize the remaining equity belonging to the JJ Arch Controlled Entities." Unfortunately, the Receiver's use of this authority to dispose of assets has also in a significant loss of value to both Independent Investors, and ultimately, through the corporate structure to me. Actions currently proposed to be taken by the Receiver threaten to cause substantial diminution in value and an increase in my personal liabilities. One such action, the closing down of an operating vintage auto dealer business, Rever Motors, on property that was thereafter zoned to prohibit such use (with the existing use grandfathered), would have the effect of diminishing the value of the property for resale, because the existing use would lapse. My indirect equity in the property, through the corporate structure, would be lost, and I would be exposed to increased liabilities, because the property's value, once it becomes subject to the zoning restrictions, may be less than the amount of the mortgage debt.

20. On March 9, 2025, YJ Simco filed its chapter 11 petition. Although my wife and I authorized the petition to be filed, the petition was signed by David Goldwasser as chief restructuring officer, and I was not offered a review of the schedules and statement of financial affairs signed by Mr. Goldwasser before they were filed. I believe these documents contained errors, and so informed Mr. Goldwasser and counsel for YJ Simco, who was selected by Mr. Goldwasser, but they refused to change the schedules. After the case was converted to chapter 7, a motion supported by Mr. Chassen, I supplied to Judge Beckerman what I believe contained a more accurate description of the assets of YJ Simco. On May 14, 2025, Judge Beckerman

granted the motion of the United States Trustee to extend of converting the YJ Simco case to chapter 7. On May 15, 2025, Gregory Messer was appointed as chapter 7 trustee, and he thereafter hired the firm of LaMonica Herbst & Maniscalco LLP as his counsel. In response to the motion of the lender on the two properties listed in the Debtor's schedules signed by Mr. Goldwasser, the YJ Simco trustee abandoned such properties. On December 15, 2025, the YJ Simco trustee, through his counsel, filed a status report, which discussed the trustee's investigative activities in the case and, despite my encouraging the trustee to pursue further investigations and litigation claims on behalf of YJ Simco, the trustee recommended dismissal of the case. I have alerted the YJ Simco trustee, the Court, and the USTP Fraud unit of the activities of concern, and until recently, I have been ignored. On January 15, 2026, the YJ Simco trustee filed a motion to dismiss the case. Although I initially opposed that motion and requested certain relief inconsistent with it, I eventually withdrew my opposition to the motion to dismiss the YJ Simco case and my requests for other relief, knowing that these issues would likely be addressed in my personal bankruptcy case. This Court was aware of the problems, given the complexity of the corporate structure, regarding my ability to raise certain issues in the YJ Simco case, and suggested that a personal bankruptcy filing would help my ability to raise these issues. The YJ Simco case was dismissed on March 24, 2026.

21. Since I was removed from my position of control of the Arch Companies, I have not had the substantial income that I previously enjoyed. Among other things, Oak has refused to make any payments to me regardless of whether they are contractually required to do so. I have been earning a small amount of income as the sole proprietor of a business restoring classic automobiles, a business different from Rever Motors, the one described above that is under the control of the Receiver. What was once a hobby is currently my sole and substantially

13

diminished source of income.  The actions described above have destroyed my reputation as a real estate investor and developer that I had worked hard to achieve for more than 20 years.

22.     I have filed this chapter 11 case, because since my removal from control of the Arch Companies, I have been subjected to a substantial amount of litigation, which is increasing due to the activities of AREH, as controlled by Oak, and the Receiver, because of the assertion of claims against me by Independent Investors.  Personal guarantees that I gave with respect to properties that had substantial value, which is now being undermined by the activities of AREH and the Receiver, are in danger of being called.  To the greatest extent possible, I seek a centralization of this litigation and a breathing spell offered by the automatic stay.  I emphasize that despite the installation of Oak in control of AREH and the Receiver in control of JJ Arch properties, there has never been a final adjudication on the merits of my rights and claims.  The installation of Oak was pursuant to a preliminary injunction.  The order appointing the Receiver is styled "Order Appointing Temporary Receiver."  Prior to the filing of my chapter 11 petition, I did not have the opportunity to conduct depositions of the principals of Oak or of Mr. Chassen to refute the allegations that they have made in multiple lawsuits.  The deposition taken of me the sole deposition of any party in several years of litigation.  Because of the litigation against GAIC and the Interpleader Action, I have lost the ability to retain counsel to defend me through the insurance I initially procured as the manager of AREH for that purpose.  I believe that a chapter 11 filing will not only provide me the opportunity for a fresh start, it will provide a vehicle for the maximization of value of my direct and indirect interests in property for the benefit of my real creditors through a confirmable chapter 11 plan.

4920-1345-1187 v.1

**The Business of Rever Motors: Acquisition, Financing, Operations and Ownership**

23. The real property for the Rever Motors business was put under contract by me, initially utilizing an entity, 266 WMTR LLC, of which I am the managing member with a 50% membership interest (my wife has the other 50% membership interest), in May of 2022. Mr. Chassen wanted to co-invest, therefore a new entity was established at the closing in or around July 2022, called 1640 Montauk LLC, a single purpose entity that had a single member, JJ Arch LLC. David Heymann from Meltzer Lippe, suggested to purchase properties this way for simplicity. An operating company, 1640 Motors LLC, was later established at the request of the lender.

24. The car business on the real property was an established business for over 100 years. Some tools and equipment came with the sale, in addition to a group of automobiles. There was a separate contract that was executed for a specific group of vehicles, many of which are still there. I explained this in the video taken during my visit to the premises on April 10, 2026, which is discussed below. The property was a wreck, full of trash and debris, over $1 million was spent in clean up and transforming the space into something functional and appealing to the community. The people in the Hamptons community hate change and caused trouble for the entity for work that was originally told that a building permit was not required (repairing roof leaks, broken windows, etc.). After a year and back and forth, the status quo was maintained with normal inspections and upkeep. Quickly thereafter, the property become an icon and was back to its glory and busy / active.

25. Mr. Chassen was insistent on a "swanky" Hamptons experience, but I focused on functionality and having a functional business plan, which involved where the business had

found its success – beach trucks and roadsters.   These vehicles where often custom built under my guidance, leadership, passion and knowledge.

26.     1640 Montauk LLC obtained a loan from Connect One Bank of New Jersey for approximately $1.5 million at the closing.  The lender required a "op co" / "prop co" style owner / operator lease structure.   The operating company was 1640 Motors LLC, which used as d/b/a, Rever Motors.   The lender actually required two leases to be put in place, in accordance with the closing documents.   1640 Motors LLC would pay rent to 1640 Montauk LLC, which would then pay the mortgage.  The current mortgagee is Watermill Capital Holdings, who bought the loan as a result of the litigation commencement .  I guaranteed the mortgage debt, as did Mr. Chassen.

27.     A residential apartment is located on the premises.  When this apartment was rented, the lease was done under 1640 Montauk LLC because of licensure and insurance reasons. The apartment was renovated for approximately $250,000 and received a proper "renters permit" from the Town of Southampton.   It was generally occupied and rent producing of $2000 to $3500 per month in rent for 12-month period.  It had seasonal rental rates that were much higher but only an occasional lease.

28.     1640 Montauk LLC was wholly owned by JJ Arch as a single member LLC.  I have been at all times the managing member for both.

29.     1640 Motors LLC was intended to be owned under the same structure, but to the best of my knowledge at this time, it does not have a signed operating agreement.   The reason for this is that, initially, there was going to be a third-party minority owner / operator for a profits interest.   Things did not work out with this individual, and his employment was terminated by December of 2022.  A contemplated operating agreement with this individual was never signed. There was a settlement agreement signed with this individual including a release.  The result is

16

that there is no operating agreement for 1640 Motors LLC.  The Internal Revenue Service issued the form SS-4 assigning the employer identification number to me, personally, as the member.  A copy of this document will be included among my hearing exhibits.

30.    Neither Mr. Chassen nor I intended to physically operate this business on a daily basis.  The main reason for the original $2.3 million purchase was for me to defer a tax gain on assets based on my ownership interest in from AREH, where there were large gains due to profit and I needed to have substantial ownership in smaller properties with large depreciation allocations, according to my accountants.

31.    The property is currently zoned for residential use, but the business operations on the property pre-date the zoning law.  As residential property, my understanding, having spoken to real estate professionals and done my own research is that the land value will be under $2 million.

32.    Since the existing business operations of automobile sales, service, rental, storage, and one legal upstairs "for rent" apartment is grandfathered for zoning purposes, for it has been my goal to preserve an operating business on the real property to take advantage of the increased value attributable to a non-conforming use.  My understanding is that the value of property with grandfathered zoning is estimated to be approximately $4 million.  With mortgage debt that was originally $1.5 million, and with any potential defaults, the pay-off amount would be approximately $2 million.

33.    When Rever Motors was an active operating business, the property had a high likelihood of obtaining an SBA loan of approximately $2 million prior to mid-2025, when the Receiver took over.

17

34.     During the first year of operations, I remotely oversaw the operations (with the prior owner continuing as the day-to-day operator / manager for compensation), while Mr. Chassen helped sporadically with administrative issues and processing.  The business required various filings and licensing through various governmental agencies, including the Internal Revenue Service and New York State licensing agencies.  The business relied on AREH accounting to help with the books and records, like all other ventures that I controlled at the time (for consistency and proper representations to lenders of my assets and liabilities).

35.     In the spring of 2023, Mr. Chassen notified me that he was "out of balance" on JJ Arch properties, including 1640 Motors LLC, and that the challenging economy ahead affected his economic position, such that his expenses would be in excess of his income, and that he was out of cash. .   He presented me with a spreadsheet that he had worked on that demonstrated this sizeable imbalance.  His struggle for cash made him stressed.  Regardless of his capital account, I told him that he could not participate in 1640 Motors any longer because it was negatively impacting the business.   A copy of the spreadsheet that Mr. Chassen presented to me showing his capital imbalance will be included among my hearing exhibits.  He asked me for a restructure of the directly owned JJ Arch entities to rectify the imbalance and avoid the consequential loss of economic interest under the provisions of the JJ Arch operating agreement as amended. Specifically, Mr. Chassen knew that if he could not maintain his equity at a 50/50 basis with mine, he was subject to Member Loan risk under section 4.2d of the JJ Arch operating agreement.

36.     By August 1, 2023, a contract was executed by Mr. Chassen, me, and others (the "August 1 Agreement") to make certain property trades to "right size" the imbalance.   He and I agreed to have David Heymann of Meltzer Lippe be counsel for the contract, waiving conflicts.

4920-1345-1187 v.1

I did not know at the time that he had been working with his cousin, David Berg, and his attorney, Jeffery Dayon, behind the scenes to vindictively and aggressively get this agreement done quickly so that he could get the benefit he needed from me before he executed the plan with Oak. A copy of the August 1 Agreement will be included among my hearing exhibits. The August 1 Agreement deals with 1640 Motors LLC and automobiles that were located on the premises. Specifically, it provides in paragraph 4 for the transfer of certain automobiles, some to me, and significantly, those listed on Schedule A to Mr. Chassen. Of the three automobiles on Schedule A, the 1993 Mercedes Benz 230 GE was purchased bv me in 2021 and titled in my name, and the 1983 Black Porsche was titled in the name of JJ Arch. Copies of these titles, which I have signed on the back on behalf of the sellers, will be included among my hearing exhibits.

37. I did not deliver the titles to these vehicles to Mr. Chassen in August of 2023, because almost immediately after the August 1 Agreement was signed, the rupture of the business relationships in the Arch companies, which I described above, occurred. In addition to the litigation and the unauthorized actions that Mr. Chassen took against me, including removing my access to my bank accounts, emails, and electronic records, Mr. Chassen took another unauthorized action concerning a JJ Arch property addressed in the August 1 Agreement, 225 HPR LLC, which owned a residence at 225 Head of Pond Road, that was rented for profit. Mr. Chassen took possession of approximately $40,000 in 225 HPR LLC revenue, for which he set up a so-called "escrow" account under his control. A copy of an electronic printout from this "225 HPR LLC ESCROW HOLDINGS" as of January 20, 2024, as filed with the state court will be included in my hearing exhibits. Mr. Chassen refused to release this improperly withheld money, essentially holding it hostage, until I delivered the titles to the two vehicles. With the

19

hope, unrealistic as it turned out, that this would help settle matters, I delivered the titles after he released the "escrow" funds in February of 2024.

38.     The problem with the August 1 Agreement was that it was done prior to litigation and assumed that the partnership would reconcile funds owed as it always did.   In this case, there was also a separate $1 million Line of Credit with Connect One Bank that came due June of 2023.   Mr. Chassen and I were supposed to pay it off 50/50, and then redraw it under the new loan terms.   Mr. Chassen informed me that, at the time, he had practically no funds, so I paid off 100% of the loan.   Unfortunately, the new line of credit could not be drawn as the lender demanded, prior to funding, that both parties agree, as a covenant, that they each have post-closing liquidity of $500,000 each.  I could agree, but Mr. Chassen could not.  I pleaded with the bank to renew the line for me only.  That was not a possibility, so we had to withdraw the funding request.  The August 1 Agreement explains the transaction.   The lack of ability to return this funding to me was very challenging, but ethics was always first for me.

39.     Mr. Chassen's conduct around the time of the August 1 Agreement demonstrates a pattern, which is relevant to the vehicles at 1640 Motors.  One such vehicle was my 1965 Land Rover army truck.   Mr. Chassen asked to borrow it in late July 2023, and I agreed.   He was supposed to return it by Friday, August 3rd, 2023.   He informed me that he was keeping my car hostage until I released to him the vehicles on Schedule A of the August 1 Agreement. I told him I would call the police.  He said that he did not care, but he ultimately dropped the vehicle off to me a few days later.  This is the first of many incidents like this, there is a pattern here.

40.     As part of this pattern, I have mentioned the setting up of the so-called "escrow" account to hold 225 HPR LLC funds hostage.  In another incident, Mr. Chassen asked to buy out the lease of another vehicle that was in my name, a 2019 Dodge Durango, some years back.   I

agreed, but it had to be properly done. The first sign of concern was that his nanny crashed the vehicle, and I got sued. When the partnership fell apart, he asked me to sign the paperwork over for this vehicle. What I did not realize was that he had already gone to the Department of Motor Vehicles ("DMV"), and used my name with his home address. A copy of the registration in my name with his address is included with my exhibits. I later learned that all personal mail for DMV was being sent to his home and he ignored all. I also lost my license as a result of his actions. As I further inquired, I did a report with the DMV and NYPD for identity theft.

41. In December of 2025, after the appointment of the Receiver, I also personally saw vehicles listed on Schedule A of the August 1 Agreement at the residence of Mr. Nick Torpey in New Windsor, New York. Mr. Torpey works for Mr. Chassen. In addition, to the vehicles listed on Schedule A of the August 1 Agreement, I saw at a second Land Rover that had been at the 1640 Motors LLC. This is not a vehicle that Mr. Chassen had purchased or acquired under the August 1 Agreement, but somehow found its way from 1640 Motors LLC after the appointment of the Receiver to Mr. Torpey's residence.

42. The vehicles on Schedule A of the August 1 Agreement were not owned by 1640 Motors LLC. The August 1 Agreement deals with this. In accordance with the way I directed the operation of the "op co" business, the only vehicles that were supposed to be owned by 1640 Motors LLC were the ones that I asked Next Gear Capital to finance, for which financing I signed a personal guarantee. Next Gear Capital required documentation to transfer the vehicles to 1640 Motors LLC before financing them in accordance with their security agreement.

43. In the operation of a car dealership business, it is not unusual for a NYS dealer to keep a title "open" until sold.

4920-1345-1187 v.1

44. When I was pushed out of AREH, and the staff was all eliminated, I was tasked to continue operations of this business, in addition to others, pretty much on my own without any office support or staff or compensation for doing so. Due to these changes, in December 2023, I had to terminate the general manager, who earned approximately $200,000 a year, because there were no funds available to pay him. I ran the business on my own from January 2024 until mid-2025 without salary or compensation. I left my family in New York City between five and six days a week to go 100 miles a way to the Hamptons carry out my duties. I funded any shortfalls through YJ Simco and then to the entity 1640 Motors LLC. The banking was through Chase until that became were impossible, due to Mr. Chassen and ensuing litigation. The banking was later switched to Citizens Bank.

45. These life changes were challenging for me and my family. I would have never done this if I had thought there was the risk of what actually occurred as a result of Mr. Chassen's unauthorized and vindictive actions.

46. With all of the turmoil and my lack of income, I was trying to make the best of the situation. 1640 Motors LLC fell behind on certain expenses, such as payroll tax and others. I used best efforts to work with the governmental agencies to establish payment plans to keep things moving forward. Additionally, Connect One Bank, who financed this property, the line of credit, the 89th St property (a long-term relationship of mine), told me that they were selling the loans because they had no tolerance for the litigation.

### Personal Property Brought to the Rever Motors Premises

47. Since the original acquisition of the business, and especially while I was supervising its daily and highly active operations, I brought my own personal property such as

22

tools, and auto parts to the premises.   I had such tools and parts, because it has been a long-time hobby of mine to restore vintage vehicles.  I have been repairing and restoring cars since I was a teenager.  The property that I owned that I brought to the premises was on the premises when the Receiver took over.  Because I acquired the property over the course of many years, and some of the tools were given to me by my family, I do not have purchase receipts.  Most of the items that I brought to the premises and are on my list of property are not store-bought items where one would pay with a credit card or check.  The sellers that I bought these items from required cash.  Most of these purchases were for small amounts of cash.

**The Present Adversary Proceeding and the Motion for Injunctive Relief**

48.      This adversary proceeding was filed the day after my bankruptcy petition was filed.  It was filed against the Receiver to obtain an injunction to enforce and expand the automatic stay to prevent the Receiver from selling assets on the premises belonging to me that became property of my bankruptcy estate when I filed my petition, and including property that I may exempt from the estate.  I also sought an injunction to prevent the shutdown of the Rever Motors business, the effect of which will, by virtue of the loss of a grandfathered exception to the local zoning laws, would result in a substantial diminution of the value of the real property on which the business has been operated.  That real property is subject to a mortgage guaranteed by me.  To the extent the real property loses value, it will have a detrimental effect on my reorganization efforts, because it will either result in the loss of equity or the expansion of my liabilities.  Notwithstanding, this highly visible property marks an icon of another portion of my career, and reputation damaged to satisfy Oak and Mr. Chassen.

49.      The Receiver opposed my motion for an injunction.  In addition, Mr. Chassen sought and was granted leave to intervene as a defendant, and he, too, opposed my motion for an

23

injunction. That Mr. Chassen, having lost his economic interest in JJ Arch, improperly asked for a Receiver has so many implications, that is not on the agenda in this motion but it goes hand in hand with the relief sought.   Putting aside the issue whether the Receiver was properly appointed, the Receiver ought to have a duty to me as the majority partner (under any set of published documents).  He appears not to be acting consistently with such a duty. In particular, the Receiver should not be closing down businesses without talking with me first. Unfortunately, that has not happened.

50.     After a hearing on March 24, 2026, this Court granted in part and denied in part my motion for an injunction in an order on March 25, 2026.  That order blocked a scheduled auction by the Receiver on the premises pending the determination by this Court of which property on the premises is property of the estate.

**The Site Visit**

51.     In advance of the visit, I was concerned about how I would be treated when I arrived at the premises.  In accordance with the procedures set up by the March 25, 2026 order, I visited the premises on April 10, 2026.   The Court is aware that it took the Court's intervention on April 10, 2026, to direct the Receiver to allow me to walk the premises freely and take photographs to be able to  achieve the goals of the Order.  I also had to call the police out of concern of my personal well-being, since I felt I the armed security guard hired by the Receiver had placed my personal safety at risk.[4]  The Receiver had also hired a videographer who accompanied me during my site visit, once we finally commenced.  The video taken of this site visit will be included among my hearing exhibits.  I urge the Court to view the video in full.  I

---

[4] I have called the police on various occasions for the theft that has occurred here.   They are aware of what is happening there but have been reluctant to do anything. because of the New York State Court proceedings.

4920-1345-1187 v.1

wish to point out that on the video I clearly point out which property is mine, which property belongs to customers, and which property belongs to the business.  I have made a number of videos in the past to illustrate to the Receiver similar concerns.  The Receiver has ignored what I submitted to him  The actions and inactions of the Receiver also impacts the customers of 1640 Motors LLC, some of whom have sued me based on the Receiver's conduct.

### The List of Property

52.     Following the site visit, in accordance with the procedures set up by the March 25, 2026 order, I created a list of property, which was filed on April 23, 2026, together with supporting documents.  The specific list, a copy of which will be included among my hearing exhibits, has 77 items (some of which are on the list are groupings of articles of personal property by category).  As indicated in the column headed "Notes / Info of Ownership of Debtor" many of the items listed came from my personal parts collection.  Included in the filing on April 23, 2026, is a set of photographs that I took during the site visit on April 10, 2026.   I ask the Court to take note of the mass quantity of items I brought to this property.

### The Receiver's Objections to the List of Property

53.     The Receiver has objected to all of the property on my list.  He claims that I have not provided sufficient documentation for any other property.  For items such as tools and equipment for which there is no such thing as a certificate of title, the Receiver has no way of knowing the ownership of the personal property on the premises.  The fact that I shared this information on this before, and it has been ignored, should be considered.   The Receiver's

25

counsel has even told this Court that the list I have provided to the Court is consistent with the information I previously supplied to the Receiver. He is correct!

54. The Receiver has also objected based on bank statements showing debits from the business supposedly to acquire personal property. As I have stated above, the business frequently needed cash infusions to operate and I often supplied such cash infusions through YJ Simco as a conduit to Rever Motors.

55. The results here are important to me beyond the specific items of personal property for one ultimate reason. What happened here illustrates the consequences of the results of my having been systematically separated from my businesses and my livelihood, as a result of various kinds of improper conduct and intentional damage to me. This situation cries out for an investigation of the conduct of the persons involved.

56. I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 8, 2026

_____
Jeffrey Solomon Simpson

26